[Cite as *State v. Lacavera*, 2012-Ohio-800.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 96242**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## WILLIAM LACAVERA

DEFENDANT-APPELLANT

---

**JUDGMENT:**
**AFFIRMED IN PART; REVERSED IN PART**
**AND REMANDED**

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-539829

**BEFORE:** Jones, J., Stewart, P.J., and Rocco, J.

**RELEASED AND JOURNALIZED:** March 1, 2012

**ATTORNEY FOR APPELLANT**

Thomas E. Conway
75 Public Square, Suite 700
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY: Holly Welsh
        Brett Kyker
Assistant County Prosecutors
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., J.:

**{¶1}** Defendant-appellant, William Lacavera, appeals his convictions for aggravated burglary, aggravated robbery, felonious assault, disrupting public service, receiving stolen property, possessing criminal tools, kidnapping, forgery, and theft. For the reasons that follow, we affirm his convictions but remand the case for a partial resentencing.

Procedural History and Facts

**{¶2}** In 2010, Lacavera was charged in an 18-count indictment with two counts each of aggravated burglary, aggravated robbery, kidnapping, felonious assault, and forgery; four counts of theft; and one count each of disrupting public service, receiving stolen property, misuse of credit cards, and possessing criminal tools. The matter proceeded to a jury trial, at which the following pertinent evidence was presented.

**{¶3}** Betty DeGirolamo testified that in July 2010 she was 75 years old and lived alone in her house in Parma. The house next door belonged to Lacavera's grandparents and he had lived in it for a short while after they died. DeGirolamo testified she knew "Billy," as she called Lacavera, since he was a child and had loaned him $2500 to pay his bills in 2009. She also gave him $500 to fix her car and lent him her car "off and on" "for a few months." Lacavera never repaid the loan.

**{¶4}** Around 11:15 a.m. on July 5, 2010, a man knocked on DeGirolamo's back door. He asked for Billy. DeGirolamo, who was hard of hearing, opened the locked door. The man pushed the door in and shoved DeGirolamo up against the wall. The

man asked her where the money was and then pushed her down the basement stairs. The man followed DeGirolamo down into the basement, raised a "tire iron" up from behind his back, ripped the phone from the wall, and asked her again where she kept her money. He told her to lay there and keep her "big F'ing mouth shut."

{¶5} DeGirolamo told the man where her purse was located. He went upstairs and she could hear him rummaging around the house. He left shortly thereafter but DeGirolamo was unable to get up. She laid on the floor until later that afternoon when her niece stopped by to take the garbage out.

{¶6} DeGirolamo was transported to the hospital by ambulance. She suffered a concussion, numerous abrasions and cuts, and spent ten days in the hospital. The man, later identified as Alvie Williams, had stolen DeGirolamo's wallet and a lockbox that contained her and her late husband's wedding rings, her engagement ring, money, and personal papers.

{¶7} Parma police responded to the scene, processed the house, and recovered a "pry bar" that had been left on DeGirolamo's bed. Police recovered DNA from Williams on the interior of the back door and DNA from Williams, Lacavera, and an "unknown individual" on the pry bar.

{¶8} Parma police officer Thurston Voisine testified that shortly after the burglary he and two other officers went to Lacavera's house in Brookpark and spoke with his girlfriend in the backyard. They found Lacavera hiding behind his pool. They asked Lacavera where he was earlier in the day and he told the officers he had gone

grocery shopping. Officer Voisine told Lacavera that his truck had been spotted in the area of a break-in and Lacavera stated that he went to his grandparent's house to check on it because there had recently been burglaries in the area. Lacavera consented to a search of his truck, but the officers did not find anything associated with the crimes. Lacavera was not arrested at this time.

{¶9} Williams testified that he met Lacavera in December 2009 through a drug connection. He testified that his relationship with Lacavera "revolved" around drugs. On July 5, he received a call from Lacavera, and the two men discussed "robbing" DeGirolamo's house. Lacavera told Williams it would be an "easy lick" and no one would be home. Williams testified that Lacavera originally brought up the idea of breaking into DeGirolamo's house a week or two prior to July 5.

{¶10} According to Williams, Lacavera picked him up at his house in Cleveland and was driving his white Ford pickup. They drove to Parma and parked the truck at Lacavera's grandparent's house. They went inside, spoke briefly, and then Williams walked over to DeGirolamo's house. Williams testified that he heard a television on inside the house so he knocked on the door. Williams stated he was surprised when DeGirolamo answered the door because Lacavera had told him no one would home. He admitted to pushing DeGirolamo down the basement stairs and stealing her wallet and lockbox.

{¶11} When Williams returned to Lacavera, he told him that he had pushed "an elderly woman" down the stairs but Lacavera "did not seem too concerned."

{¶12} Williams testified that the two men left, drove to Cleveland, and spent the stolen money on "some pills." They then went to Williams's house where they shared the pills with Williams's girlfriend, Rhanjani Rosado. Lacavera, Williams, and Rosado, then drove to several grocery stores where Rosado used the stolen credit card. A surveillance video tape entered into evidence showed Lacavera driving his truck into the parking lot of Dave's Supermarket with Williams and Rosado. Williams and Rosado went into the grocery store while Lacavera stayed in his car. Lacavera also used the stolen credit card to buy gas.

{¶13} The three separated and Williams and Rosado continued to use the stolen credit card at various stores. Later the same day, Lacavera picked Williams up and drove him to Sandusky, Ohio, to try and sell the coins that had been in the lockbox, but they did not end up selling them.

{¶14} Williams testified that he tried to use the stolen credit card the next day, but the card had been cancelled. He went and pawned the coins and jewelry; Williams received $837 for the items, which he kept.

{¶15} On July 15, the police arrested Williams and Rosado at home. Both gave oral and written statements implicating Lacavera. During his testimony, Williams verified phone records of text messages he had sent to Lacavera leading up to and after the burglary. Williams testified that he pled guilty to burglary and robbery and agreed to testify against Lacavera.

{¶16} Rosado testified that she lived with Williams and knew Lacavera because he

and Williams spoke every day. Lacavera would call Williams searching for Oxycontin. On July 5, Williams received a call from Lacavera who later came to pick Williams up in his white truck. When the men returned, Williams had a credit card that he told Rosado belonged to his grandmother. She admitted to using the credit card at several stores to buy things for Williams and clothes and shoes for her kids.

{¶17} Rosado testified that later in the day Williams received another call from Lacavera. Lacavera picked Williams up. The two men returned to Williams's house around 10:30 p.m. A week later, Rosado asked Williams about the credit card. Rosado then called Lacavera, who told her it was "from a lick." When Rosado and Williams were arrested on July 15, Rosado told officers she had used the credit card but did not know it was stolen. She made oral and written statements to the detective and made a second written statement in October 2010. Rosado testified she pled guilty to one count each of forgery and obstructing justice and agreed to testify against Lacavera.

{¶18} Parma police detective David Milter testified regarding his investigation into the home invasion. He testified that when he first spoke with Lacavera on July 8, Lacavera was only "a person of interest" in the case; Lacavera denied being involved in the burglary.

{¶19} After Detective Milter reviewed the credit card records from DeGirolamo's bank, he and another detective went to the stores where her credit card had been used and viewed surveillance video. An employee of CVS pharmacy identified Rosado. He arrested Williams and Rosado at their house and Rosado identified Lacavera.

{¶20} Later that day, Lacavera came to the police station and was shown a photo line-up with Williams's picture in it. He did not identify Williams as someone he knew. The detective then advised Lacavera of his rights and showed him surveillance photos of Rosado and Williams. At that time, Lacavera acknowledged knowing the couple. He also identified his white truck. He told the detective that he had given the couple a ride to the grocery store and also admitted to recently using drugs.

{¶21} Based on the evidence presented at trial, the jury convicted Lacavera of one count of aggravated burglary, aggravated robbery, felonious assault, disrupting public service, receiving stolen property, and possessing criminal tools; two counts of kidnapping and forgery; and three counts of theft. The trial court sentenced Lacavera to a total of six years in prison.

{¶22} It is from this conviction that Lacavera now appeals, raising the following three assignments of error for our review:

> I. The trial court erred in failing to grant appellant's motion for judgment of acquittal on the charges of [aggravated burglary], [kidnapping], [aggravated robbery], and [felonious assault.]
>
> II. The jury's verdicts of guilty as to all counts of which appellant was found guilty were against the manifest weight of the evidence.
>
> III. The offenses of [aggravated burglary], [kidnapping], [aggravated robbery], and [felonious assault] were allied offenses of similar import and should merge for purposes of sentencing.

### Sufficiency and Manifest Weight of the Evidence

{¶23} Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding

that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, 2011 WL 2536451, ¶ 11, citing *State v. Braxton*, 10th Dist. No. 04AP-725, 2005-Ohio-2198, 2005 WL 1055819, ¶ 15. Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency. *Id.* We find the manifest weight of the evidence argument dispositive here.

{¶24} The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Although there may be sufficient evidence to support a judgment, a court may nevertheless conclude that a judgment is against the manifest weight of the evidence. *Id.*

{¶25} When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶26} Lacavera argues that there was insufficient evidence to support his convictions for aggravated burglary, kidnapping, aggravated robbery, and felonious assault and these convictions were against the manifest weight of the evidence.[1]

{¶27} Lacavera claims that because Williams testified that Lacavera told him no one would be home at the victim's house, there was no evidence that he was complicit in the crimes because he did not intend for DeGirolamo to get hurt. Lacavera claims that Williams, on his own accord, harmed DeGirolamo and Lacavera could not be held accountable for anything Williams chose to do when he encountered the victim. We disagree.

{¶28} The state proceeded on a theory that Lacavera was complicit in the crimes because he aided and abetted Williams. "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus. "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist. 1971).

---

[1] Lacavera does not challenge the sufficiency of the evidence as to the remaining counts for which he was convicted; therefore, we will not consider whether the state provided sufficient evidence to sustain those convictions or whether they were against the manifest weight of the evidence.

**{¶29}** A defendant is presumed to have intended the reasonably foreseeable, natural, and probable consequences of his acts. *State v. Clark*, 55 Ohio St.2d 257, 379 N.E.2d 597 (1978); *State v. Lockett*, 49 Ohio St.2d 48, 358 N.E.2d 1062 (1976); *State v. Farmer*, 156 Ohio St. 214, 102 N.E.2d 11 (1951). This presumption is rebuttable and the matter is one ultimately for the trier of fact. *State v. Wright*, 2d Dist. No. CA 6394, 1980 WL 352497 (Sep. 30, 1980).

**{¶30}** Lacavera claims that the state provided insufficient evidence that he was complicit in harming the victim because he did not think she would be home at the time of the burglary. But in *Lockett*, the Ohio Supreme Court recognized that a defendant may be convicted as an aider or abettor when there is no prior criminal plan to commit a specific act. Specifically, the Court found that the record established

> "that the appellant participated in the planning and commission of the robbery and acquiesced in the use of a deadly weapon to accomplish the robbery. Under these circumstances, it might be reasonably expected by all the participants that the victim's life would be endangered by the manner and means of performing the act conspired." *Id.* at 62.

The Court concluded, "the appellant, as well as the other participants is bound by all the consequences naturally and probably arising from the furtherance of the conspiracy to commit the robbery." *Id.*

**{¶31}** Likewise, here, Lacavera is bound by the consequence that arose from the conspiracy he and Williams had to commit the burglary. There was ample evidence at trial that Lacavera organized the commission of the crime. He called Williams and told him that burglarizing the victim's home would be "an easy lick." Lacavera had lived

next door to DeGirolamo and had previously borrowed money from her and her car. DeGirolamo testified at trial that she saw Lacavera's truck in his grandparents' driveway on the day of the burglary. Williams testified that Lacavera drove him to DeGirolamo's house and waited next door while the crimes were committed. The two men then left and went to buy drugs with the money Williams took from DeGirolamo's home. Williams further testified that he told Lacavera that he had pushed the elderly victim down the stairs and Lacavera did not appear concerned. Lacavera then drove Williams and Rosado to different stores so they could use the victim's credit card. Finally, physical evidence linked Lacavera to the crime as his DNA was found on the prybar Williams left in DeGirolamo's home.

{¶32} Based on these facts, the jury did not lose its way or create a manifest miscarriage of justice in convicting Lacavera. Accordingly, his convictions were not against the manifest weight of the evidence. This conclusion is also dispositive of his claim that his convictions were not supported by sufficient evidence.

{¶33} The first and second assignments of error are overruled.

<u>Sentencing</u>

{¶34} In the third assignment of error, Lacavera argues that his convictions for aggravated burglary, kidnapping, aggravated robbery, and felonious assault should have merged because they were allied offenses of similar import.

{¶35} When a defendant's conduct results in the commission of two or more "allied" offenses of similar import, that conduct can be charged separately, but the

defendant can be convicted and sentenced for only one offense. R.C. 2941.25(A).    In 2010, the Ohio Supreme Court modified the test for determining whether offenses are allied offenses of similar import.    *State v. Johnson*, 128 Ohio St.3d 1405, 2010-Ohio-6314, 942 N.E.2d 1061.    The Court directed trial courts to look at the elements of the offenses in question and determine whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other.    *Id.* at ¶ 46.

{¶36} If the answer to such question is in the affirmative, the court must then determine whether the offenses were committed by the same conduct.    If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and must merge. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there is a separate animus for each offense, then the offenses will not merge.    *Id.* at ¶ 48-51.

{¶37} Lacavera maintains that his convictions were allied because he, as Williams's co-conspirator, committed them with the same animus; therefore, they should have merged for the purposes of sentencing.    As it pertains to this assignment of error, Lacavera was convicted of kidnapping, in violation of R.C. 2905.01(A)(2); aggravated robbery, in violation of R.C. 2911.01(A)(3); felonious assault, in violation of R.C. 2903.11(A)(1); and    aggravated burglary, in violation of R.C. 2911.11(A)(1).    We will consider each conviction in turn.

Kidnapping, Aggravated Robbery, and Felonious Assault

**{¶38}** Lacavera was convicted of aggravated robbery, in violation of R.C. 2911.01(A)(3), which reads:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

**{¶39}** Lacavera was further convicted of kidnapping, in violation of R.C. 2905.01(A)(2):

(A) No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter.

**{¶40}** Lacavera was convicted of felonious assault pursuant to R.C. 2903.11(A)(1), which provides: "No person shall knowingly * * * [c]ause serious physical harm to another * * *."

**{¶41}** In *State v. Hicks*, 8th Dist. No. 95169, 2011-Ohio-2780, 2011 WL 2376467, ¶ 11, we noted the following guidelines first set forth in *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), to determine "whether kidnapping and an offense of similar import are committed with separate animus" were still applicable. In *Logan*, the Ohio Supreme Court held that:

(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to

sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions. *Logan*, at the syllabus.

**{¶42}** In this case, there is nothing in the record that would lead us to conclude that the type or length of restraint Williams used against DeGirolamo satisfies any of the factors set forth in *Logan* such that the kidnapping was not an allied offense of similar import to aggravated robbery and felonious assault. The victim's "restraint of movement" was incidental to the robbery of her property and the serious physical harm Williams caused. Accordingly, the trial court should have merged these charges prior to sentencing. *State v. Fears*, 86 Ohio St.3d 329, 344, 715 N.E.2d 136 (1999); *State v. Stall*, 3d Dist. No. 3-10-12, 2011-Ohio-5733, 2011 WL 5353506; *State v. Wilson*, 8th Dist. No. 91971, 2010-Ohio-1196, 2010 WL 1110973, affirmed by 129 Ohio St.3d 214, 2011-Ohio-266, 951 N.E.2d 381; *State v. Hicks*, 8th Dist. No. 95169, 2011-Ohio-2780, 2011 WL 2376467, ¶ 18.

**{¶43}** Next, we consider whether the felonious assault and aggravated robbery merge and find that they do. Williams committed the felonious assault when he knowingly caused serious physical harm to the victim by pushing her down her basement steps. He completed the offense of aggravated robbery when he then stole her property. We find that the offenses were committed with the same animus. *See generally State v.*

*Darnell*, 5th Dist. No. 10 CAA 10 0083, 2011-Ohio-3647, 2011 WL 3057333.

<u>Aggravated Burglary</u>

**{¶44}** Finally, in considering whether the aggravated burglary is allied to the convictions for felonious assault, kidnapping, and aggravated robbery, we find that it is.

**{¶45}** Aggravated burglary, in violation of R.C. 2911.11(A)(1), provides:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> > (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
> >
> > * * *.

**{¶46}** There is little doubt that it is possible to commit the aggravated burglary and commit the aggravated robbery, kidnapping, and felonious assault as charged with the same conduct. Moreover, based on this record, the aggravated burglary was committed with the same animus as the felonious assault, kidnapping, and aggravated robbery. Although one could argue that Lacavera and Williams only had the initial intent to burglarize the victim's home and that intent was separate from the intent to harm her once Williams discovered she was present in the house, Lacavera was convicted of a violation of R.C. 2911.11(A)(1). Williams's breaking into the house and inflicting physical harm on the victim by pushing her down the stairs (and thus completing the aggravated burglary) occurred as part of the same transaction as the other crimes. Therefore, it was

committed with the same animus.

**{¶47}** In sum, Lacavera may be found guilty of felonious assault, kidnapping, aggravated robbery, and aggravated burglary but sentenced for only one. Therefore, the case is remanded for resentencing on these charges. At the sentencing hearing, it is the state that will elect which allied offense it will pursue against Lacavera. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 25.

**{¶48}** Therefore, the conviction is affirmed in part, reversed in part, and the case is remanded for resentencing as outlined above.

It is ordered that appellant and appellee split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR.,   JUDGE

KENNETH A. ROCCO, J., CONCURS;
MELODY J. STEWART, P.J., CONCURS
IN JUDGMENT ONLY