[Cite as *State v. Walker*, 2012-Ohio-4274.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 97648

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DWAYNE WALKER

DEFENDANT-APPELLANT

## JUDGMENT:
## CONVICTIONS AFFIRMED;
## SENTENCE VACATED IN PART;
## REMANDED FOR RESENTENCING

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-549326

**BEFORE:** Boyle, P.J., Cooney, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** September 20, 2012

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
2077 East 4th Street
Second Floor
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
BY:   Brent C. Kirvel
Assistant County Prosecutor
9th Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

{¶1} Defendant-appellant, Dwayne Walker ("Dwayne"), [1] appeals his

convictions and sentence.   He raises seven assignments of error for our review:

Assignment of Error One

The manifest weight of the evidence did not support any conviction.

Assignment of Error Two

The state produced insufficient evidence to support any of its convictions.

Assignment of Error Three

The trial court erred by issuing jury instructions that extended the Castle
doctrine to a guest in the home of another.

Assignment of Error Four

Defense counsel was ineffective by cumulative error; failure to offer the
proper jury instruction on self-defense; failure to object to playing
defendant's interview.

Assignment of Error Five

The trial court acted contrary to law when it imposed consecutive sentences
without authority to do so under the Ohio Revised Code.

Assignment of Error Six

The trial court erred when it failed to make statutorily necessitated findings
before imposing consecutive sentences.

---

[1] We will refer to defendant-appellant by his first name due to the victim having the same last
name (although not related to defendant-appellant).

Assignment of Error Seven

The trial court erred in failing to merge all allied offenses.

{¶2} We find merit to Dwayne's sixth assignment of error. Thus, we affirm his sentence in part, vacate it in part, and remand for resentencing pursuant to H.B. 86.

Procedural History and Facts

{¶3} Dwayne and co-defendant, Ivan Maddox, were indicted on six counts: two counts of aggravated murder in violation of R.C. 2903.01(A) and (B), one count of aggravated burglary in violation of R.C. 2911.11(A)(2), one count of aggravated robbery in violation of R.C. 2911.01(A)(1), and two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (2). All of the counts carried one- and three-year firearm specifications. The following facts were presented to a jury.

{¶4} Darquez Walker was fatally shot at the home of Maurice Thornton around 1:00 a.m. on Sunday, April 10, 2011. Darquez had been at Thornton's home "shooting dice" in the basement all evening. Several of Thornton's and Darquez's friends were also "shooting dice" with them, including Ricky Jackson, John Butler, Jamal Wilson, and Aaron Crosby.

{¶5} Thornton's cousin, Erica Freeman, and Maddox arrived at Thornton's house that night around the same time; according to Freeman, it was around midnight. Freeman testified that she stopped at Thornton's house after she left a bar near Thornton's house. She and a friend parked at Thornton's neighbor's house. When they pulled up,

she saw Maddox standing in Thornton's driveway. Maddox followed her into Thornton's house.

{¶6} Thornton and Freeman said that Maddox was intoxicated. Although Thornton and Maddox were friends, Thornton became angry with Maddox for "touching" Freeman. Freeman left after Maddox "grabbed" her. When Freeman and her friend pulled out of the neighbor's driveway, Freeman saw Maddox and another person standing in Thornton's driveway.

{¶7} Thornton testified that after Freeman left, Maddox said, "I got five niggers that's about to rob next door." Maddox left soon after that. Thornton told Jackson to lock the door behind Maddox, so Jackson went upstairs to do so. Thornton heard Jackson say, "Man, I ain't got nothing." Thornton heard someone fall to the ground, and then Jackson fell down the stairs. A man came down the steps after Jackson; the man was wearing black pants, a white shirt, and a blue bandana around his mouth. Thornton recognized the man as Dwayne, whom he had first met a few days earlier when Maddox brought Dwayne to Thornton's house.

{¶8} Thornton said that he, Crosby, Butler, and Wilson ran to the laundry room, where it was dark. Thornton testified that Dwayne said, "you all niggers come the fuck out." Then Dwayne said, "you all think I'm playing," and cocked his gun. According to Thornton, Dwayne came into the laundry room and started shooting. Darquez ran out of the laundry room and up the stairs; Jackson followed him. After that, Dwayne left too. They turned on the lights and saw blood. Crosby called 911.

**{¶9}** Crosby, Wilson, Butler, and Jackson all testified. They told the same basic story as Thornton with minor variations, except that none of them could identify Dwayne. Jackson explained that when he went upstairs to make sure the door was locked, a man put a gun to his head and said, "lay it down." The man "shoved" Jackson down the stairs, and walked past Jackson toward the laundry room. Jackson heard the man say, "if you don't all come out here, I'm going to start shooting." Jackson said the man just started shooting at that point. Jackson ran out of the house with Darquez following him. Darquez ran with Jackson until he collapsed.

**{¶10}** Crosby testified that when they heard Jackson screaming upstairs that he "ain't got nothing," they all knew immediately that they were being robbed. Crosby said that he ran into the laundry room with the others and grabbed his gun, a "380" that he had hidden in the ceiling of Thornton's basement. Crosby hid beside a table in the laundry room; he was lying on the ground, but half sitting up. When the robber came into the laundry room, Crosby testified that he began to feel Crosby's pockets and put his gun to Crosby's head. Crosby waved the robber's gun away and fired back from his position on the ground. Crosby fired five shots. Crosby said the robber fired first. Crosby did not know if he hit the robber, but thought that he might have due to his close proximity.

**{¶11}** Crosby testified that after the robber left, he picked up all of the spent bullets and put them in a plastic bag along with his gun and threw them out Thornton's back door. Crosby had a pending charge against him for hiding evidence.

**{¶12}** Wilson testified that after they all ran into the laundry room, he heard the robber say, "I ain't playing," and then heard the robber fire two shots.

**{¶13}** William Flood testified that he picked up Dwayne earlier that evening. They had planned to go to a bar, Bootleggers, on Euclid Avenue. They went to Maddox's house to pick him up too. Maddox and his brother were drinking and "shooting dice" when they arrived. Flood said that Dwayne "joined in" and started winning their money. Flood said that Maddox wanted to find another dice game.

**{¶14}** Flood testified that he drove to Bootleggers and parked in the parking lot. When they got there, Maddox and Dwayne disappeared. Flood denied that he knew anything about the robbery. Flood further denied that he knew where Maddox and Dwayne were going, but he "assumed" that they were going to Thornton's house. Flood had "played dice" before at Thornton's.

**{¶15}** Flood waited for Maddox and Dwayne for a short time, but then decided to call other friends to meet him at the bar. As he did, Maddox came running back to the car, got in, and told Flood to leave. Flood refused. Flood testified that Maddox kept saying, "I shouldn't have done it." Flood further testified that Maddox was not wearing a shirt when he came back to the car. Soon after Maddox returned, Dwayne appeared, wearing a white shirt covered with blood. They drove Dwayne to the hospital.

**{¶16}** Maddox pleaded guilty to robbery and testified against Dwayne in exchange for receiving an expected prison term of three to four years. Maddox testified that on the evening of April 9, 2011, Flood and Dwayne came to his house. Maddox said that

he and Dwayne started talking about "robbing a dice game." The plan was that Maddox would "go down or whatever, like [he] was shooting dice down there, just chilling, and [Dwayne] would be waiting outside to walk [him] back in as if [he] was getting robbed." According to Maddox, Flood was aware of what they were doing, but did not have anything to do with it.

{¶17} Maddox said that after they parked at Bootleggers, he and Dwayne walked to Thornton's house. Maddox went into the house with Freeman, while Dwayne "walked off." Maddox went downstairs, and hung out with everyone in the basement. Maddox began to feel bad about intending to rob his friends. He stayed about ten minutes, just watching their dice game. Maddox decided not to rob his friends, so he left. He walked out the back door. Dwayne was sitting on the back porch waiting for him to come out. Maddox said that he told Dwayne "there ain't no money" downstairs, "it's dead." Dwayne got upset and told Maddox, "I knew you were going to chicken out. We done. Came here for nothing." Maddox said that as he began to leave, Dwayne started looking in the basement windows. Dwayne could see that "there was money down there and gambling or whatever." Maddox testified that he did not talk to Dwayne after that. Maddox walked back to Flood's car. Maddox did not see what Dwayne did after he left.

{¶18} Maddox testified that when he got back to Flood's car, Flood asked him where Dwayne was. Maddox said that after a couple of minutes, they saw Dwayne "coming up the street [with] bullets in his chest."

{¶19} A paramedic at Richmond Heights Medical Center testified that he was working when Dwayne came to the hospital. The paramedic gave Dwayne's possessions to police: clothes, a loaded gun magazine, a baggy with nine smaller bags of marijuana in it, and a spent bullet fragment from Dwayne's shoes.

{¶20} When police arrived at the scene, they secured the home and began interviewing witnesses. The police learned that a victim of a gunshot wound was at Richmond Heights Medical Center; the victim was Dwayne. They believed the victim might have something to do with the shooting. Soon after arriving on the scene, they also discovered Darquez's body lying on the ground in a nearby driveway. Police called the paramedics, who took Darquez to the hospital.

{¶21} While they were interviewing witnesses, a neighbor, Marvin Martin, approached police. Martin testified that it was approximately 4:00 a.m. when he talked to the police. Martin told the police that he had seen two men run separately from Thornton's home. Martin said that the second man ran across his yard, holding his chest, and dropped something on the tree lawn near his home. Martin assumed it was a gun. Martin testified that the second man was wearing a white T-shirt and a mask. Martin did not tell police initially because he did not want to get involved.

{¶22} Martin testified that he had been at Thornton's house all day watching television. He said that he left Thornton's around midnight. When he went back outside, he saw the men running.

{¶23} After Martin pointed to the "nearby" tree lawn, where he saw the man drop something, officers found a Glock model 23, 40-caliber semiautomatic handgun ("Glock pistol"); the gun was covered in blood. A supervisor of the trace evidence department for the Cuyahoga County Medical Examiner's Office testified that several swabs of blood were taken from the Glock pistol and submitted for DNA testing, two from the gun slide and frame, one from inside the gun barrel, two from the gun grip, and two from the magazine. A forensic scientist in the DNA department of the Cuyahoga County Regional Forensic Science Laboratory testified that only one representative blood sample from the Glock pistol was tested, from the gun slide, and it matched Dwayne's DNA.

{¶24} After talking to the witnesses, police officers obtained a search warrant. They found the gun, spent bullets, and cartridges that Crosby had thrown in the backyard; Crosby's gun was a Hi-Point 380-caliber semiautomatic handgun ("Hi-Point pistol"). They found a bullet fragment on the floor of the laundry room, several bullet holes in the laundry room, a brass shell casing located on a folding table inside Thornton's home, and a "projectile" found underneath the basement steps. They also obtained blood samples from all over the house, including one from the front door of Thornton's home, one from the kitchen floor, one from the wall on the basement stairs, and one from the laundry room — all of the samples matched Dwayne's DNA. They found approximately $360 hidden in a shoe in the laundry room. They also found drugs and paraphernalia hidden throughout the house.

**{¶25}** A forensic scientist at the Bureau of Criminal Identification and Investigation ("BCI") testified that police submitted two firearms for testing. The first was the Glock pistol with six cartridges, or unfired bullets, that were submitted with the gun. There was one cartridge in the Glock pistol and the other five were in an envelope. Police also submitted the Hi-Point pistol, fired bullets, and fired cartridge cases.

**{¶26}** After comparing the fired cartridge cases, the BCI scientist determined that two of the fired cartridge cases that were found at the scene came from the Glock pistol. He was also able to determine that three of the fired 380-caliber cases came from the Hi-Point pistol.

**{¶27}** Detective Daniel Novitski testified that after Dwayne got out of the hospital, he interviewed him via video recording. The video interview was played for the jury. Dwayne told police that on the evening of April 9, 2011, he had been with his girlfriend earlier in the day. He said he called Maddox, who was "shooting dice" with his brother. Maddox told Dwayne he was down $5,500 and wanted to find another dice game. Maddox was not wearing a shirt. Maddox went into Thornton's house first. Dwayne went into Thornton's house through the front door. He thought Maddox was behind him. As he walked into the basement, someone turned the lights off. Dwayne said that he saw people scatter in the basement, and then someone shot him. He went back to Flood's car.

**{¶28}** Dwayne continuously denied that he had a gun. He denied that he intended to rob anyone; he said he did not need to rob anyone because he had a pocket full of

money.    Dwayne told Detective Novitski that he believed that Maddox thought Dwayne would die from his gunshot wounds and so Maddox set him up.    When Detective Novitski asked Dwayne how the gun magazine ended up in his pocket, Dwayne said that maybe someone put it there when he passed out in the car.    Dwayne could not explain how his blood got on the gun or why he continued to walk all the way to the laundry room after someone turned off the basement lights.

{¶29} During the trial, the state withdrew Count 1 of the indictment (aggravated murder with prior calculation and design).    At the close of the state's case, Dwayne moved for a Crim.R. 29 acquittal on the remaining charges, which the trial court denied.

{¶30} The jury found Dwayne not guilty of aggravated murder, but guilty of the lesser included offense of murder.    The jury also found Dwayne guilty of aggravated robbery and aggravated burglary, not guilty of felonious assault under R.C. 2903.11(A)(1), but guilty of felonious assault under R.C. 2903.11(A)(2).

{¶31} The trial court merged Dwayne's firearm specifications and merged his felonious assault conviction into his felony murder conviction.    It sentenced Dwayne to a total of 28 years to life in prison: 15 years to life for murder, plus three years for the gun specifications; 10 years for aggravated burglary, to be served consecutive to the 15 years for murder; and 10 years for the aggravated robbery, to be served concurrent with the other terms.    The trial court further notified Dwayne that he would be subject to five years of mandatory postrelease control upon his release from prison.    It is from this judgment that Dwayne appeals.

<u>Sufficiency and Manifest Weight of the Evidence</u>

**{¶32}** In his first and second assignments of error, Dwayne contends that the state's evidence against him was not sufficient and that his convictions were against the manifest weight of the evidence.

**{¶33}** When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶34}** In reviewing a claim challenging the manifest weight of the evidence,

> [t]he question to be answered * * * is whether there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

(Internal quotes and citations omitted.) *Leonard* at ¶ 81.

**{¶35}** Dwayne was convicted of felony murder, aggravated burglary, aggravated robbery, and felonious assault. The state had to present sufficient evidence on each element of these crimes, which are as follows.

**{¶36}** Under R.C. 2903.02(B), felony murder, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]"

**{¶37}** R.C. 2911.11(A)(2), aggravated burglary, provides that

[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * * [t]he offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

**{¶38}** R.C. 2911.01(A)(1), aggravated robbery, states:

[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]

**{¶39}** Under R.C. 2903.11(A)(2), felonious assault, "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

**{¶40}** In support of his sufficiency arguments, Dwayne simply incorporates his arguments from his manifest-weight-of-the-evidence arguments. Thus, we will focus solely on Dwayne's arguments relating to manifest weight of the evidence. Dwayne argues that the "gamblers" spent 15 to 30 minutes inside the home after the shooting, tainting the crime scene before the police arrived. He contends that the "gamblers" identified him as the robber only after others told them his name. And he claims that

Marvin Martin never told police that he had been at Thornton's house all evening. These arguments, however, are without merit.

{¶41} Although it is true that Crosby hid evidence, the jury was well aware of this fact — and the fact that police discovered the bag with the gun and bullets after they obtained the search warrant.

{¶42} We further disagree with Dwayne that the "gamblers" only identified him after someone else told them his name. Only Thornton testified that he recognized Dwayne during the robbery; none of the other "gamblers" could identify him. Further, it was not the witnesses who identified Dwayne as the shooter. The police obtained Dwayne's name from the hospital because he was a victim of a gunshot wound. Police then pieced the evidence together that Dwayne was a possible suspect.

{¶43} Finally, it was never established at trial that police did not know that Martin had been at Thornton's house all evening. It was not established in any of the police officers' testimony, the detective's testimony, or Martin's testimony.

{¶44} Dwayne further cites many instances where he questions the credibility of the witnesses, including the fact that they all initially lied to police and some of them changed their stories more than once. While true, the jury heard about each and every instance. Each witness testified on direct-examination about lying to police in their initial statements. Through cross-examination, defense counsel further questioned the witnesses about their lies to police and the inconsistencies between their stories. After

hearing all of the evidence, however, the jury was well within its purview to believe the witnesses over Dwayne.

{¶45} Dwayne spends a considerable amount of time arguing how under "the state's theory," Dwayne could not have been the shooter, "allegedly shooting downward on Aaron Crosby from the entrance of the laundry room." But the state's theory was not just that Dwayne fired "down" at Crosby. As John Butler testified, after the shooting began, "it was like a war * * * in there." Crosby did not even testify that the shooter only shot at him; Crosby testified that Dwayne shot first. Thornton said that Dwayne came into the laundry room and started shooting. Wilson stated that the man came into the room, said "you all come out," and then started shooting.

{¶46} After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the credibility of witnesses, and resolving conflicts in the evidence, we conclude that this is not the exceptional case where the jury clearly lost its way and created such a manifest miscarriage of justice that Dwayne's convictions must be reversed and a new trial ordered.

{¶47} Indeed, the jury heard evidence that Martin saw Dwayne running from Thornton's house, holding his chest, and dropped something that turned out to be the 40-caliber Glock pistol with Dwayne's blood all over it. A paramedic found a loaded 40-caliber gun magazine in Dwayne's pocket. Further, 40-caliber fired cartridges were found at the scene that were determined to be fired from the Glock pistol. And Dwayne

could not explain how his blood got on the gun or how the loaded magazine got into his pocket.

{¶48} Further, in Dwayne's own statement to the police, he went into Thornton's house believing that Maddox was following him. But it is highly probable that even if that were true, Dwayne would have realized fairly quickly that no one was following him. Dwayne continued to walk down the basement stairs without Maddox — even though he did not know anyone. Dwayne said that as he was on the steps, someone turned off the lights. He then saw people scatter and someone started shooting at him. Still, Dwayne continued to walk into the basement to the laundry room in the dark. But when asked why he continued to walk all the way to the laundry room where Thornton and the others were hiding, Dwayne stated that he just wanted to figure out what was happening. The jury was free to believe the other witnesses over Dwayne.

{¶49} This is simply not the exceptional case where the jury clearly lost its way. We further conclude that the state presented sufficient evidence on each offense such that the jury could convict Dwayne beyond a reasonable doubt. Accordingly, Dwayne's first and second assignments of error are overruled.

## Jury Instructions

{¶50} In his third assignment of error, Dwayne argues that the trial court erred when it instructed the jury on the Castle Doctrine. He claims that the trial court incorrectly extended the Castle Doctrine to Crosby, who was a guest in Thornton's home.

Dwayne further claims that the trial court's improper instruction "wrongfully justified Crosby's action in the eyes of a jury."

{¶51} Dwayne concedes that because his trial counsel did not object to the jury instruction provided by the court, we review this issue under the plain error standard. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶52} Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *Barnes* at 27. Courts are to notice plain error under Crim.R. 52(B), "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" (Citation omitted.) *Id.*

{¶53} A jury instruction is proper where "(1) the instruction is relevant to the facts of the case; (2) the instruction gives a correct statement of the relevant law; and (3) the instruction is not covered in the general charge to the jury." *State v. Kovacic*, 11th Dist. No. 2010-L-065, 2012-Ohio-219, ¶ 15.

{¶54} Here, the trial court instructed the jury:

> A person, Aaron Crosby, is presumed to have acted in self-defense and/or the defense of another when using defensive force that was intended or likely to cause death or great bodily harm to another, defendant Dwayne Walker[,] [i]f that person, defendant Dwayne Walker, was in the process of entering or had entered unlawful and without privilege to do so, the residence or dwelling occupied by Maurice Thornton, Jamal Wilson, Aaron Crosby, Ricky Jackson, Darquez Walker, and John Butler.

The presumption of both self-defense and defense of others when using defensive force is a rebuttal [sic] presumption. This presumption does not apply if defendant Dwayne Walker proves by the greater weight of the evidence that he had a right to be in the residence or dwelling or he was a lawful resident of the residence or dwelling in which the event occurred.

{¶55} R.C. 2901.05, which sets forth burdens and degree of proof and presumptions concerning self-defense or defense of another, states that "[e]very person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution." R.C. 2901.05(A). "The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense," however, "is upon the accused." *Id.*

{¶56} Self-defense is an affirmative defense, and thus, the accused has the burden to prove it by a preponderance of the evidence. *State v. Smith*, 10th Dist. No. 04AP-189, 2004-Ohio-6608, ¶ 16. To establish self-defense through the use of deadly force, defendants must prove (1) they were not at fault in creating the situation giving rise to the affray, (2) they had a bona fide belief that they were in imminent danger of death or great bodily harm and their only means of escape from such danger was the use of such force, and (3) they must not have violated any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus.

{¶57} Given the three-part test, "a person may not kill in self-defense if he has available reasonable means of retreat from the confrontation." *State v. Jackson*, 22 Ohio St.3d 281, 283-284, 490 N.E.2d 893 (1986). The duty to retreat "derives from the

common-law rule that the right to kill in self-defense may be exercised only if the person assaulted attempted to 'retreat to the wall' whenever possible." *State v. Thomas*, 77 Ohio St.3d 323, 326-327, 673 N.E.2d 1339 (1997).

{¶58} By contrast, a person attacked in his or her own home has no duty to retreat before using force in self-defense. R.C. 2901.09(B); *State v. Williford*, 49 Ohio St.3d 247, 250, 551 N.E.2d 1279 (1990), quoting *State v. Peacock*, 40 Ohio St. 333, 334, 1883 Ohio LEXIS 303 (1883) (stating that "'[w]here one is assaulted in his home, or the home itself is attacked, he may use such means as are *necessary* to repel the assailant from the house, or to prevent his forcible entry, or material injury to his home, even to the taking of life'"). Commonly referred to as the Castle Doctrine, this exception to the duty to retreat "derives from the doctrine that one's home is one's castle and one has the right to protect it and those within it from intrusion or attack." *Thomas* at 327.

{¶59} In 2008, the Ohio General Assembly expanded the reach of the Castle Doctrine through S.B. 184, creating a presumption that a person acts in self-defense "when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used * * * has unlawfully and without privilege to do so entered the residence * * * occupied by the person using the defensive force." R.C. 2901.05(B)(1). The presumption of self-defense may be rebutted if the state establishes by a preponderance of the evidence that the person against whom the defensive force was used had a right to be in, or was a lawful resident of, the residence. R.C. 2901.05(B)(2) and (3).

**{¶60}** The expanded version of the Castle Doctrine, set forth in R.C. 2901.05(B)(1), creates a rebuttable presumption that a defendant acted in self-defense. The burden is then shifted to the state to rebut the presumption of self-defense by establishing by a preponderance of the evidence that the defendant was in the home or vehicle lawfully. R.C. 2901.05(B)(2) and (3).

**{¶61}** We disagree with Dwayne that the Castle Doctrine does not extend to invited guests in another's home. Under R.C. 2901.05(B)(1), the person using defensive force must "occupy" (not own) the residence or vehicle that the intruder enters. Further, R.C. 2901.05(D)(3) explicitly defines "residence" as "a dwelling in which a person resides either temporarily or permanently or is visiting as a guest."

**{¶62}** We do find it troubling, however, that the trial court instructed the jury on the Castle Doctrine at all. Here, Aaron Crosby — the invited guest — was not on trial. Had Aaron Crosby been charged with Darquez's death or shooting Dwayne, then Aaron Crosby would have been entitled to a jury instruction on the rebuttable presumption that he acted in self-defense when he shot his Hi-Point firearm. But because Crosby was not on trial, the Castle Doctrine was wholly inapplicable to the facts of this case.

**{¶63}** Even more troubling, the trial court misstated the law on the Castle Doctrine in charging the second part of the instruction — where it instructed the jury that the presumption in Aaron Crosby's favor "does not apply if defendant Dwayne Walker proves by the greater weight of the evidence that he had a right to be in the residence or dwelling or he was a lawful resident of the residence or dwelling in which the event

occurred." The trial court improperly informed the jury that the presumption shifted the burden to Dwayne — the defendant — to prove that he was lawfully in Thornton's home. The Castle Doctrine, as set forth in R.C. 2901.05(B)(1), gives a defendant the presumption of self-defense — that the state must then rebut by a preponderance of the evidence. Dwayne did not have to prove anything in this case.

{¶64} Thus, the trial court erred in instructing the jury that Aaron Crosby was entitled to the presumption that he acted in self-defense and in charging the jury that Dwayne had to prove that he was lawfully in Thornton's residence. This court, however, must still determine if the trial court's error rose to the level of prejudicial error, i.e., but for the trial court giving the erroneous instruction to the jury, the outcome of the trial clearly have been different.

{¶65} We conclude that Dwayne would have been convicted without the erroneous instruction. As we summarized previously, police found a loaded 40- caliber gun magazine in Dwayne's pocket at the hospital, matching a 40-caliber Glock pistol that was found at the scene — with Dwayne's blood all over it. Police also matched fired cartridges found at the scene to the Glock pistol. And Dwayne's blood was found in the laundry room, where all the shots were fired.

{¶66} Accordingly, Dwayne's third assignment of error is overruled.

Ineffective Assistance of Counsel

{¶67} In his fourth assignment of error, Dwayne argues that his counsel was ineffective because he (1) failed to object to leading questions; (2) failed to offer jury

instructions of traditional self-defense; and (3) failed to object to the state playing Detective Novitski's unedited video interview with Dwayne to the jury.

**{¶68}** To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and that strategy and tactical decisions exercised by defense counsel are well within the range of professionally reasonable judgment. *Strickland* at 699.

A. Failure to Object to Leading Questions

**{¶69}** Regarding the state's use of leading questions, the Ohio Supreme Court has explained that because "it is within the trial court's discretion to allow leading questions[,] * * * the failure to object to any leading questions [does not] constitute ineffective assistance of counsel." *State v. Jackson*, 92 Ohio St.3d 436, 449, 751 N.E.2d 946 (2001).

**{¶70}** Further, the failure to object to leading questions will almost never rise to the level of ineffective assistance of trial counsel because "[e]ven if the testimony elicited involves disputed or controversial facts, experienced trial counsel may reasonably decide

not to object." *State v. Jones*, 2d Dist. No. 20349, 2005-Ohio-1208, ¶ 28. This is because "forcing opposing counsel to ask non-leading questions [could] make a witness's adverse testimony more impressive to the jury, and hence more damaging." *Id.*

**{¶71}** We have reviewed the pages cited by Dwayne where he claims his trial counsel failed to object to leading questions and find no error.

B.       Failure to Object to Playing Unedited Video Interview

**{¶72}** Dwayne maintains that any probative value the unedited version of Detective Novitski's videotaped interview of him was "far outweighed by the undue prejudice it caused" because the jury heard the detectives (1) repeatedly call Dwayne a liar, (2) say that he planned the robbery, (3) say that he caused the death of Darquez, (4) say that the jury will never believe his story, and (5) repeat the unverified lies of the gamblers.

**{¶73}** Generally, the failure to object is viewed as a trial strategy and will not establish a claim of ineffective assistance of counsel. *State v. Gumm*, 73 Ohio St.3d 413, 428, 653 N.E.2d 253 (1995).

**{¶74}** After reviewing the record, we conclude that trial counsel's failure to object to the entire video being played for the jury amounted to trial strategy. Throughout the video, Dwayne repeatedly denied that he had anything to do with the robbery. He further claimed that Maddox set him up to be robbed. And he continued to tell the detectives that he never had a gun. The jurors were able to hear Dwayne assert his innocence for 90 minutes. Trial counsel used the video statement in closing arguments,

telling the jury to consider the fact that Dwayne had maintained his innocence for 90 minutes in the face of interrogation by the detectives. Thus, Dwayne's defense counsel was not deficient.

C.    Failed to Offer a Self-Defense Jury Instruction

**{¶75}** Dwayne further argues that his trial counsel was ineffective for failing to offer a jury instruction on "traditional self-defense." Although his argument is somewhat confusing, Dwayne is not asserting that his trial counsel should have offered an instruction on self-defense because *he* acted in self-defense. In this argument, Dwayne incorporates the reasoning set forth in his third assignment of error regarding the trial court's instructing the jury on the Castle Doctrine. In his third assignment of error, Dwayne argued that the trial court should have instructed the jury on "traditional" self-defense for Aaron Crosby, rather than instruct the jury on Aaron Crosby's "rights" under the Castle Doctrine. Thus, here, Dwayne is arguing that his trial counsel was ineffective for failing to object to the Castle Doctrine being given *on Aaron Crosby's behalf* and for failing to offer that the traditional self-defense instruction be given *for Aaron Crosby*. Again, Dwayne is not asserting that he acted in self-defense (he denied that he ever had a gun).

**{¶76}** After reviewing the record, we disagree that Dwayne's trial counsel should have requested a traditional self-defense instruction for Aaron Crosby for the same reason we concluded that the trial court erred in instructing on the Castle Doctrine at all — Aaron Crosby was not on trial. As for not objecting to the Castle Doctrine being given,

we agree that trial counsel should have objected. Nonetheless, we find no prejudice based on the same reasoning we set forth in Dwayne's third assignment of error.

{¶77} Dwayne's fourth assignment of error is overruled.

Consecutive Sentences

{¶78} In his fifth and sixth assignments of error, Dwayne contends that the trial court erred when it sentenced him to consecutive prison terms because it was contrary to law. He further argues that the trial court failed to make the necessary statutory findings before imposing consecutive sentences.

{¶79} H.B. 86 took effect on September 30, 2011. Dwayne was sentenced on November 17, 2011. The General Assembly expressly provided in Section 4 of H.B. 86: "The amendments * * * apply to a person who commits an offense specified or penalized under those sections on or after the effective date of this section[.]" Therefore, the trial court was required to sentence Dwayne according to the revisions implemented in H.B. 86.

{¶80} One of the noteworthy changes to the felony sentencing laws concerns the purposes of felony sentencing, as stated in R.C. 2929.11(A). The two primary purposes of felony sentencing remain "to protect the public from future crime by the offender and others and to punish the offender * * *." *Id.* These goals, however, are to be realized "using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." *Id.* This

mandate to utilize the minimum sanctions the court determines necessary is a new provision, added by H.B. 86.

{¶81} The provisions of Section 11 of H.B. 86 explain the General Assembly's intent with regard to reviving findings a trial court must make before imposing consecutive sentences:

> In amending division (E)(4) of section 2929.14 and division (A) of section 2929.41[2] of the Revised Code in this act, it is the intent of the General Assembly to simultaneously repeal and revive the amended language in those divisions that was invalidated and severed by the Ohio Supreme Court's decision in *State v. Foster*, [109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470]. The amended language in those divisions is subject to reenactment under the United States Supreme Court's decision in *Oregon v. Ice*, [555 U.S. 160, 129 S.Ct. 711 (2009)], and the Ohio Supreme Court's decision in *State v. Hodge*, [128 Ohio St.3d 1, 2010-Ohio-6320, 941 N.E.2d 768] and, although constitutional under *Hodge*, *supra*, that language is not enforceable until deliberately revived by the General Assembly.

{¶82} R.C. 2929.14(C)(4), as revived, now requires that a trial court engage in a three-step analysis in order to impose consecutive sentences. First, the trial court must find that "consecutive service is necessary to protect the public from future crime or to punish the offender." *Id.* Next, the trial court must find that "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." *Id.* Finally, the trial court must find that at least one of

---

[2]It appears that the General Assembly failed to amend R.C. 2929.41(A) properly; it failed to properly change the internal reference from the former R.C. 2929.14(E)(4) to the newly revived R.C. 2929.14(C)(4). Nonetheless, it is clear from the legislature's stated intent that it revived the former presumption for concurrent sentences in R.C. 2929.41(A) unless the trial court makes the required findings for consecutive sentences in R.C. 2929.14(C)(4).

the following applies: (1) the offender committed one or more of the multiple offenses while awaiting trial or sentencing, while under a sanction, or while under postrelease control for a prior offense; (2) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct; or (3) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. *Id.*

{¶83} In each step of this analysis, the statutory language directs that the trial court must "find" the relevant sentencing factors before imposing consecutive sentences. R.C. 2929.14(C)(4). In making these findings, a trial court is not required to use "talismanic words to comply with the guidelines and factors for sentencing." *State v. Brewer*, 1st Dist. No. C-000148, 2000 Ohio App. LEXIS 5455, *10 (Nov. 24, 2000). But it must be clear from the record that the trial court actually made the findings required by statute. *See State v. Pierson*, 1st Dist. No. C-970935, 1998 Ohio App. LEXIS 3812 (Aug. 21, 1998). A trial court satisfies this statutory requirement when the record reflects that the court has engaged in the required analysis and has selected the appropriate statutory criteria. *See State v. Edmonson*, 86 Ohio St.3d 324, 326, 715 N.E.2d 131 (1999).

{¶84} Notably, however, the General Assembly deleted R.C. 2929.19(B)(2)(c) in H.B. 86. This was the provision in S.B. 2 that had required sentencing courts to state

their *reasons* for imposing consecutive sentences on the record. Accordingly, a trial court is not required to articulate and justify its findings at the sentencing hearing. A trial court is free to do so, of course. But where, as here, there is no statutory requirement that the trial court articulate its reasons, it does not commit reversible error if it fails to do so, as long as it has made the required findings.

{¶85} Here, the trial court stated at the sentencing hearing that it remembered the facts of the case well. It explained that it recalled Dwayne's "lack of remorse shown through [the] trial and throughout the proceedings." The court reviewed Dwayne's criminal history, which included a 2008 conviction for receiving stolen property. While on community control for the 2008 conviction, Dwayne was found guilty of receiving stolen property a second time. The trial court further explained that while Dwayne was still on community control, he was found guilty of attempted breaking and entering, "twice being on community control sanctions." The trial court said to Dwayne, "[s]o that did not do anything to curb your criminal behavior." The trial court then proceeded to sentence Dwayne.

{¶86} The trial court did not make an express finding under R.C. 2929.14(C)(4). It did discuss Dwayne's criminal history, which could equate to making two of the findings, namely (1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender, and (2) that the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. But the trial court failed to make the mandatory finding

that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. R.C. 2929.14(C)(4).

**{¶87}** Accordingly, the trial court's judgment sentencing Walker is affirmed except the portion where it ordered the aggravated robbery and aggravated burglary sentences to be served consecutive to the murder sentence. This case is remanded to the trial court to consider whether consecutive sentences are appropriate under H.B. 86, and if so, to enter the proper findings on the record.

**{¶88}** Dwayne's fifth assignment of error is overruled (as consecutive sentences are permitted), but his sixth assignment of error is sustained.

## Allied Offenses

**{¶89}** In his seventh and final assignment of error, Dwayne argues that the trial court erred at sentencing when it only merged felonious assault with felony murder. He maintains that the trial court should have also merged his aggravated robbery and aggravated burglary convictions with his felony murder conviction. Again, Dwayne did not object to the trial court's merging only the felonious assault and felony murder convictions. It is plain error, however, to impose multiple sentences for allied offenses of similar import. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 31.

**{¶90}** Under Ohio law, "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information

may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). But

> [w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(B).

{¶91} This statute, enacted in 1974, "codified the judicial doctrine of merger" and "prohibited the 'cumulative punishment of a defendant for the same criminal act where his conduct can be construed to constitute two statutory offenses, when, in substance and effect, only one offense has been committed.'" *State v. Ware*, 63 Ohio St.2d 84, 86, 406 N.E.2d 1112 (1980), quoting *State v. Roberts*, 62 Ohio St.2d 170, 172-173, 405 N.E.2d 247 (1980).

{¶92} The Ohio Supreme Court set forth the analysis for determining whether offenses are allied offenses subject to merger in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. In *Johnson*, the Supreme Court overruled *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999), and held that "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id*. at the syllabus. It explained the test as follows:

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind."

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

(Internal citation omitted.)  *Id*. at ¶ 48-51.

**{¶93}** The question we must answer under the first test in *Johnson* is whether it is possible to commit aggravated burglary, aggravated robbery, and felony murder with the same conduct.[3]  We find that it is.

**{¶94}** If a defendant enters someone's home, without privilege to do so and another person is present, with the intent to steal property, and the defendant has a gun on his or her person, and brandishes or uses it, that conduct could also result in the commission of a felony murder if a person dies as a result of the defendant's conduct. The fact that the state has to prove that a death resulted from the defendant's conduct

---

[3]We set forth the elements of these offenses in our analysis on sufficiency and weight of the evidence.

does not change the analysis. It is the defendant's conduct that we look to when determining whether two offenses are allied.

**{¶95}** Turning to the second test under *Johnson*, which is much more difficult, we must look to the facts of the case to determine whether the offenses of aggravated burglary, aggravated robbery, and felony murder were committed by the same conduct or animus, i.e., "a single act, committed with a single state of mind." *Id*. at ¶ 49.

**{¶96}** In this case, Dwayne entered Maurice Thornton's home without privilege to do so to rob Thornton and his friends. He had a single animus — to rob the "gamblers." When Dwayne got to the bottom of the steps, however, Thornton and his friends had run to the laundry room. At that point, Dwayne chose to continue down the basement stairs, toward the laundry room where everyone was hiding. Dwayne threatened Thornton and the others that he would shoot them if they did not come out. He then fired his gun. Darquez died as a result of the actions set in motion by Dwayne.

**{¶97}** Although the events, according to each witness's testimony, happened in a very short amount of time, we conclude that they were committed with a separate animus. Dwayne's initial intent was to rob the "gamblers," while brandishing a gun. But when Dwayne chose to fire his gun, there was a substantial increase in the risk of harm to those who were in the basement, separate and apart from the underlying crimes of aggravated robbery and burglary. *See State v. Anderson*, 1st Dist. No. C-110029, 2012-Ohio-3347, citing *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345, syllabus (where restraint or asportation exposes the victim to a substantial increase in the risk of harm, the offenses of

kidnapping and robbery are committed with a separate animus). Indeed, because Dwayne chose to fire his gun, a "shooting war" broke out and Darquez died as a result. Accordingly, we conclude that the aggravated burglary and aggravated robbery were committed separately from the felony murder.

{¶98} Dwayne asserts that this case is analogous to *State v. Lacavera*, 8th Dist. No. 96242, 2012-Ohio-800, where this court held that aggravated burglary, aggravated robbery, kidnapping, and felonious assault were allied offenses. But we find that case to be distinguishable on its facts. In *Lacavera*, the defendant entered the victim's home, pushed her down the stairs, and then robbed her. Here, Dwayne entered Thornton's home, pushed Jackson down the stairs, and then in an attempt to rob the "gamblers," pulled out his gun and began shooting. Again, we find that this separate act of firing a gun exposed the "gamblers" to a substantial increase in the risk of harm such that a separate animus exists for the offenses.

{¶99} Dwayne's seventh assignment of error is overruled.

{¶100} Convictions affirmed; sentence affirmed in part and vacated in part; case remanded for the trial court to consider whether consecutive sentences are appropriate under H.B. 86, and if so, to enter the proper findings on the record.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, PRESIDING JUDGE

MARY EILEEN KILBANE, J., CONCURS;
COLLEEN CONWAY COONEY, J., CONCURS IN JUDGMENT ONLY