[Cite as *State v. Lewis*, 2013-Ohio-3974.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| | | **CASE NO. 2012-L-074** |
| - vs - | : | |
| RICCI R. LEWIS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 11 CR 000736.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen A. Sheppert*, Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Paul A. Mancino, Jr.,* Mancino, Mancino & Mancino, 75 Public Square, Suite 1016, Cleveland, OH 44113-2098 (For Defendant-Appellant).


THOMAS R. WRIGHT, J.

{¶1} This appeal is from the final judgment in a criminal proceeding before the Lake County Court of Common Pleas. Following a jury trial, appellant, Ricci R. Lewis, was found guilty on multiple counts of aggravated burglary and aggravated robbery, and one count of felonious assault. He contends that his conviction cannot stand because various prejudicial errors were committed at trial and during the sentencing hearing.

{¶2} This case concerns a home invasion at approximately 11:00 p.m. on the

evening of April 5, 2011. The home is part of a duplex on Richmond Street in Painesville, Ohio, and was being rented by Russell Perry and Shaquetta Page. Shaquetta's three minor children were also permanent residents in the home. In addition, one of Russell's minor daughters would occasionally spend the night there.

{¶3} Even though the couple's home had two entranceways, the back door was used as the primary means for entering the residence. The back door leads directly into the kitchen. Upon exiting the kitchen and moving forward are the dining room and then the living room. At one side of the living room is a staircase leading to the second floor, where three bedrooms are located.

{¶4} On the evening at issue, Russell and Shaquetta had a late dinner with her three children and one of Russell's daughters. When the meal ended shortly before 11:00 p.m., Shaquetta and all four children went upstairs to prepare for bed. However, Russell stayed downstairs to clean the kitchen. Near the end of this process, Russell took the trash outside to a container near the back door.

{¶5} As Russell was re-entering the home and beginning to shut the back door, two men pushed on the door and forced their way into the kitchen. Initially, the first man pushed Russell backward with his hands. As Russell tried to resist, the second intruder produced a small silver firearm and placed the barrel directly on Russell's forehead. At that time, the second man said directly to Russell: "[Y]ou know what it is, we want everything, * * *."

{¶6} Although Russell no longer tried to resist, the two intruders continued to push him across the room until he fell to the floor by the refrigerator. During the course of the confrontation, the two men struck Russell on his head a number of times, and he

2

sustained a number of scrapes and bruises on his face and skull.

{¶7} When Russell was finally subdued, he was lying on his stomach with his face pressed on the floor. The first man sat on top of Russell's torso and held his head down. At first, Russell thought the first man was pressing the barrel of a firearm to the back of his head; thus, he made no attempt to get up for a short period. While lying on the floor, Russell saw the second man exit the kitchen and walk through the dining room and living room.

{¶8} After going through the living room, the second intruder went up the stairs and started down the hallway toward Shaquetta's bedroom. As the man walked toward her, Shaquetta was talking on her cell phone to her sister. Initially, Shaquetta believed that the man entering her room was her brother; as a result, she told her sister goodbye and "hung up" the phone. She then turned toward the second man and quickly realized her mistake. However, before she could do anything, the second man again pulled out the small firearm, placed it against Shaquetta's head, and said that he was going to rob her.

{¶9} Immediately after making the statement to Shaquetta, the second intruder heard a police siren going off in the distance. In response, he grabbed the cell phone from Shaquetta's hands, ran over to her bedroom dresser, and momentarily looked for something else to take. When he did not see anything, he ran into the hallway and went down the stairs. After quickly checking upon the welfare of the four children, Shaquetta followed the second man to the first floor.

{¶10} While the second man was upstairs, Russell realized that the first man did not have a gun, but was instead forcing Russell's head down with his knuckles. In light

3

of this, Russell began to resist again, and was able to throw the first intruder off.  Upon getting to his feet, Russell shoved the first man toward the back door, and was quickly able to force him out the door.  The first man then ran through the back yard and leaped over a fence into a neighbor's yard.  Although Russell followed the first man outside and saw him go over the fence, he did not try to chase him any further.  Rather, he ran down his driveway, intending to go across the road and use a phone in a local business to call the police.

{¶11}  After going downstairs, the second intruder ran to the kitchen and went out the back door.  Russell never saw the second man exit the home.  However, Shaquetta followed the second man out the back door and saw him leap over the fence on the side of the yard.  She then walked toward the street at the front of the home and met Russell in the middle of the roadway.  Since Russell's daughter had used her cell phone to call the police while the incident was still ongoing, the police arrived at the scene within five minutes after the second intruder ran away.

{¶12}  Neither of the intruders was apprehended the evening of the incident.  In speaking to the police upon their arrival at the scene, Russell stated that he previously had seen the first intruder, i.e., the man who held him down on the kitchen floor, at various places in the neighborhood, but could only recall that his first name was "Ricci."  This name was not sufficient to enable the police to immediately identify the first man.  Regarding the separate intruder with the firearm, Shaquetta likewise told the police that she recognized him from the neighborhood.  Even though she also tried to provide a first name for the second intruder during her initial statement to the police, that name was incorrect, and it was not until a few days later that Shaquetta's friends informed her

4

of the second man's correct first name.

{¶13} Despite the fact that Shaquetta never saw the intruder who held Russell on the kitchen floor, she had a general idea of who he was based upon Russell's basic description. Approximately three days after the incident, Shaquetta and Russell were at a local tavern having drinks when Shaquetta saw the first intruder enter the bar. Upon recognizing Shaquetta, the man came over to the couple and spoke directly to Russell. Specifically, the man stated that Russell should not have contacted the police about the incident, and that they could have settled the matter "in the streets." When Russell did not respond, the man left them and went to another area of the tavern.

{¶14} Once this confrontation was over, Shaquetta and Russell exited the tavern and contacted the Painesville police. After meeting the police in the bar's parking lot, Shaquetta explained what had just occurred, and then accompanied an officer back into the bar where she identified the man in question. Based upon this, the police escorted the man outside and conducted a brief interview about the home invasion. Even though the police did not arrest the man at the time, they were able to establish that the man was Ricci R. Lewis, appellant.

{¶15} After an initial complaint was filed in the Painesville Municipal Court, the county grand jury returned a seven-count indictment against appellant in late December 2011. These charges included two counts of aggravated burglary, a first-degree felony under R.C. 2911.11(A), three counts of aggravated robbery, a first-degree felony under R.C. 2911.01(A), one count of felonious assault, a second-degree felony under R.C. 2903.11(A), and one count of complicity to aggravated robbery, a first-degree felony under R.C. 2923.02(A). In addition to the primary offense, each of the counts also had

5

a firearm specification, under which it was asserted that appellant displayed or used a firearm while committing the underlying defense.

{¶16} Immediately prior to trial, the state dismissed the charge of complicity to aggravated robbery. As a result, appellant was tried on the identical six charges brought against his co-defendant, Carvell J. Fomby, who was identified as the "second man" during the home invasion. Given that the charges against appellant and Fomby were predicated upon the same facts, their trials were consolidated.

{¶17} After an initial delay of approximately 45 days, appellant was able to post bond and was released during the majority of the pretrial period. Three weeks prior to the scheduled date of his trial, appellant had another brief encounter with Shaquetta at a second bar/tavern in Painesville. According to Shaquetta, appellant approached her and indicated that he had read her prior testimony during a preliminary hearing before the municipal court. Appellant then offered her money to drop the pending charges, and also stated that there were "girls" in the neighborhood who were looking to assault her.

{¶18} Upon declaring appellant indigent, the trial court appointed counsel on his behalf. After the case was pending for three months, the appointed attorney moved to withdraw as counsel on the basis that appellant was not cooperating in his defense and was not accepting sound legal advice. Without waiting for the state to respond, the trial court overruled the motion to withdraw. Along the same lines, at the outset of his trial, appellant personally requested the trial court to appoint him a new trial attorney for the reason that he was not confident that his present counsel could provide adequate legal representation. After hearing separate statements from the state, appellant himself, and his present trial counsel, the trial court denied the pro se motion for new counsel.

6

{¶19} Appellant's three-day jury trial was conducted in May 2012. Russell and Shaquetta were the primary witnesses for the state. In relation to appellant's role in the home invasion, Russell testified that he was absolutely certain appellant was the person who pushed the back door open, helped wrestle him to the kitchen floor, and then sat upon him to keep him subdued. Additionally, both Russell and Shaquetta stated that a firearm had been held to their heads during the course of the incident. At the close of the evidence, the jury found appellant guilty on all six counts and firearm specifications.

{¶20} After the county probation department prepared a presentencing report, the trial court held a separate sentencing hearing. First, concerning the two aggravated burglary counts, the court concluded that these offenses had to be merged for purposes of sentencing. Second, as to the remaining three counts relating solely to Russell, the trial court similarly held that two of the aggravated robbery counts and the sole felonious assault count would be merged. Accordingly, appellant was only sentenced on a single count of aggravated burglary, two counts of aggravated robbery, and two of the firearm specifications. In addition to imposing two three-year terms for the firearm specifications, the court ordered appellant to serve two concurrent terms of eight years on the aggravated robbery counts, and a six-year term on the remaining burglary count, to be served consecutively to the "aggravated robbery" terms, for an aggregate term of twenty years.

{¶21} In appealing his entire conviction and sentence, appellant has asserted twenty assignments of error for review:

{¶22} "[1.] Defendant was denied his Sixth Amendment right to counsel when the court refused to allow court-appointed counsel to withdraw because of a breakdown

7

in the attorney-client relationship.

**{¶23}** "[2.] Defendant was denied due process of law when the court refused to grant a continuance to defendant to obtain counsel after defendant was remanded to jail because of a failure to appear at a hearing before a different judge for which he had no notice.

**{¶24}** "[3.] Defendant was denied due process of law when the court amended the indictment as to Ricci Lewis.

**{¶25}** "[4.] Defendant was denied due process of law when the court instructed that a meeting between defendant and Shaquetta Page gave rise to an inference of consciousness of guilt.

**{¶26}** "[5.] Defendant was denied due process of law when the court improperly singled out the 'one witness' rule.

**{¶27}** "[6.] Defendant was denied due process of law when the court improperly referenced defendant as an accomplice.

**{¶28}** "[7.] Defendant was denied due process of law when the court lessened the burden of proof by instructing on the gist of the offense.

**{¶29}** "[8.] Defendant was denied due process of law when the court failed to inform the jury that it must unanimously agree on theory in order to find defendant guilty.

**{¶30}** "[9.] Defendant was denied due process of law when the court imposed consecutive sentences which were contrary to law.

**{¶31}** "[10.] Defendant was denied due process of law when the court rotely recited the statutory criteria for imposing consecutive sentences.

**{¶32}** "[11.] Defendant was denied due process of law and subjected to

unconstitutional multiple punishments when he was set to be sentenced on two firearm specifications arising out of the same transaction.

{¶33} "[12.] Defendant was denied due process of law and equal protection of the law when he received a greater sentence than the co-defendant.

{¶34} "[13.] Defendant was subjected to unconstitutional multiple punishments when the court failed to merge all offenses into one offense of aggravated burglary.

{¶35} "[14.] Defendant was denied due process of law when the court sentenced defendant for merged offenses.

{¶36} "[15.] Defendant was denied due process of law when he was convicted and sentenced under a multiplicitious (sic) indictment.

{¶37} "[16.] Defendant was denied due process of law when the court overruled his motion for judgment of acquittal.

{¶38} "[17.] Defendant is entitled to a new trial as the verdicts are against the manifest weight of the evidence.

{¶39} "[18.] Defendant was denied due process of law when the court improperly imposed court costs.

{¶40} "[19.] Defendant was denied due process of law when this case was improperly transferred from the original assigned judge to a new judge.

{¶41} "[20.] Defendant was denied effective assistance of counsel."

{¶42} Since appellant's first two assignments raise interrelated issues, they will be addressed together. Under both assignments, he contends that the trial court erred in requiring his original court-appointed counsel to represent him at trial. First, appellant maintains that his pro se motion for the appointment of new counsel should have been

9

granted because he was able to show that there had been a breakdown in his ability to communicate with his trial attorney. Second, he submits that the trial court failed to give proper consideration to counsel's written request to withdraw from the case.

{¶43} As previously noted, trial counsel's pretrial motion to withdraw was based upon his perceived inability to communicate with his client. In this regard, counsel stated that he not only found it difficult to physically locate appellant to schedule meetings, but he could not get appellant to cooperate in the formulation of trial strategy. Similarly, appellant's oral request for a continuance and appointment of new counsel was also based upon an allegation of a lack of communication. Specifically, he asserted that trial counsel had failed to keep him properly informed as to when he was required to appear before the trial court. In addition, appellant asserted that he did not have full confidence in his counsel because counsel failed to understand the significance of a misstatement in a police report.

{¶44} In reviewing a decision on a motion for a change of appointed counsel, an appellate court will only reverse the trial court if there has been an abuse of discretion. *State v. Sanders*, 11th Dist. Lake No. 2007-L-062, 2008-Ohio-1126, ¶9. In this exact context, an abuse of discretion connotes an attitude on the part of the trial court that is arbitrary, unreasonable or unconscionable. *Id*.

{¶45} As to the standard to be employed in ruling upon a motion for a change of appointed counsel, this court has stated:

{¶46} "As a general proposition, an indigent criminal defendant does not have a constitutional right to choose the attorney who will represent him at the expense of the state; rather, he is only entitled to competent legal representation. *State v. Horn*, 6th

10

Dist. No. OT-03-016, 2005 Ohio 5257, at ¶11. As a result, the request of a defendant to discharge his court-appointed counsel will be granted only if he can 'show a breakdown in the attorney-client relationship of such a magnitude as to jeopardize the defendant's right to effective assistance of counsel.' *State v. Coleman* (1988), 37 Ohio St.3d 286, * * *, paragraph four of the syllabus. See, also, *State v. Henness* (1997), 79 Ohio St.3d 53, 65, 1997 Ohio 405, * * *.

{¶47} "In applying the foregoing basic standard, the courts of this state have recognized three examples of good cause which would warrant the discharge of court-appointed counsel: (1) a conflict of interest; (2) a complete breakdown of communication; and (3) an irreconcilable conflict which could cause an apparent unjust result. *Horn*, 2005 Ohio 5257, at ¶11, quoting *State v. Blankenship* (1995), 102 Ohio App.3d 534, 558, * * *. In light of the nature of the three examples, it has been further held that the substitution of counsel should be allowed only if extreme circumstances exist. *State v. Glasure* (1999), 132 Ohio App.3d 227, 239, * * *.

{¶48} "In regard to a possible breakdown of the attorney-client relationship due to a lack of communication, the Supreme Court of Ohio has expressly said that the Sixth Amendment right to counsel was not intended to guarantee that a criminal defendant will have a 'rapport' with his attorney. *Henness*, 70 Ohio St.3d at 65, citing *Morris v. Slappy* (1983), 461 U.S. 1, * * *. Accordingly, the existence of hostility or a personal conflict between the attorney and the defendant does not constitute a total breakdown so long as it does not inhibit the attorney from both preparing and presenting a competent defense. *State v. Meridy*, 12th Dist. No. CA2003-11-091, 2005 Ohio 241; *State v. Mayes*, 4th Dist. No. 03CA9, 2004 Ohio 2027. Moreover, the lack of

communication must be permanent in nature before a finding of a complete breakdown can be made. *State v. Evans*, 153 Ohio App.3d 226, 2003 Ohio 3475, at ¶32, * * *. Finally, a dispute over the trial tactics or strategy of the attorney is not sufficient to establish the requisite breakdown. *Id.*" *State v. Jackson*, 11th Dist. Trumbull No. 2004-T-0089, 2006-Ohio-2651, ¶43-45.

{¶49} In this case, appellant initially argued before the trial court that he wanted to discharge his court-appointed counsel because he had sufficient funding to hire his own private attorney. In support of this point, he told the trial court that he had already contacted a specific attorney and had a preliminary discussion about his case. Yet, the trial record shows that, as of the first day of appellant's trial, no new counsel had made an appearance on his behalf. This was despite the fact that appellant was released on bond approximately three months before the date of his trial, and thus had considerable time in which to hire new counsel. In light of this, the trial court could justifiably find that appellant was still indigent and had not been able to accumulate enough funding to hire his own counsel.

{¶50} As to the alleged breakdown of communication between appellant and his court-appointed counsel, appellant told the trial court that, even though he had given his cell phone number to counsel when he was released on bond, counsel had not given him timely notice of upcoming events in this case. According to appellant, this was the reason he had not been present at a mandatory court hearing, leading to the issuance of a warrant for his arrest. In response, trial counsel indicated that, despite the fact that he had tried two distinct phone numbers and had left messages for appellant, it always was extremely difficult to contact his client. Trial counsel also stated that whenever he

12

was able to meet with appellant, his client was argumentative and would not accept any legal advice.

{¶51} In denying appellant's motion for a change of counsel, the trial court noted that, as a condition of appellant's bond, he was specifically required to keep in contact with his trial counsel. Based upon this and the statements of trial counsel, the trial court could justifiably conclude that the lack of communication between the attorney and his client was solely attributable to appellant, and that appellant's actions were simply a means of delaying the beginning of his trial while he was out on bail. To this extent, the statements before the trial court warranted the conclusion that there had actually been no breakdown of communication due to incompatibility, but solely because appellant's desire to obtain a third continuance of his trial.

{¶52} Regarding appellant's assertion that he was uncomfortable with the legal adequacy of trial counsel's representation, appellant could only cite one example of counsel's alleged failure to protect his rights. He stated that, in reviewing a copy of a police report provided to him by trial counsel, he noticed that the report stated that Russell and Shaquetta had described their assailants in the home invasion as both having facial tattoos. Supposedly, when appellant brought to his trial counsel's attention that he did not have any tattoos on his face, counsel admitted that he had not noted the statement in the police report.

{¶53} As to this point, during the trial proceedings, there was no dispute concerning appellant's identity as one of the two men who entered Russell's home on the night in question. Thus, it cannot be said that counsel was unable to discern an important issue in the case. To this extent, appellant's assertions before the trial court

were not sufficient to demonstrate that trial counsel had failed to provide adequate representation for appellant, especially in light of the fact that appellant was not assisting in his own defense.

{¶54} As a separate issue, appellant contends that his right to due process was violated when the trial court overruled trial counsel's motion to withdraw without holding an oral hearing on the matter. Even though no hearing was conducted at the time counsel's motion was filed, the trial court held a full hearing on the "representation" issue at the time appellant made his pro se motion at the beginning of his trial. During that hearing, both appellant and counsel were accorded a full opportunity to state the grounds for their respective motions. Accordingly, any initial procedural error by the trial court was not ultimately prejudicial to appellant.

{¶55} Considered as a whole, the record does not indicate the existence of an extreme situation in which appellant and trial counsel were no longer able to communicate as a result of a serious disagreement regarding the type of defense which should be used at trial. Instead, the lack of full communication was due to appellant's choice not to cooperate with his court-appointed counsel. Under such circumstances, the trial court did not abuse its sound discretion in refusing to grant a continuance or not appointing new trial counsel for appellant. Appellant's first and second assignments of error do not have merit.

{¶56} Under his third assignment, appellant maintains the trial court improperly amended the indictment by not instructing the jury on the third count of the indictment. He contends that the lack of reference to the third count rendered the remainder of the jury instructions so confusing that he was denied a fair trial.

{¶57} Prior to trial, the state orally moved to dismiss the third count of the indictment against appellant, and the trial court granted this motion. As a result, the remaining counts in appellant's indictment corresponded to the charges in the co-defendant's indictment. Therefore, there is no merit to appellant's contention that the jury instructions were confusing to the jury, or that the trial court improperly amended the indictment.

{¶58} As part of this assignment, appellant claims that the trial court erred in not instructing the jury on the elements of the underlying offenses in the various charges of aggravated burglary and aggravated robbery. Specifically, he submits that the court was obligated to define the offenses of theft, robbery, and assault. But, in addressing this issue in relation to the crime of burglary, the Supreme Court of Ohio has held that jury instructions covering the underlying offenses of such a crime is not necessary because the underlying offenses are not viewed as actual elements of the crime. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶71. Accordingly, the jury instructions were not legally flawed. Appellant's third assignment is not well taken.

{¶59} Under his next assignment, appellant argues that the trial court erred in allowing Shaquetta to testify as to the encounter she had with appellant approximately three weeks prior to trial. As previously noted, Shaquetta testified that, in confronting her alone in a local bar, appellant offered to pay her money to dropped the charges in the pending criminal case. Although appellant's trial counsel objected to the testimony, the trial court admitted it as evidence of a guilty conscious. Appellant contends that her testimony should have been excluded as evidence of a prior bad act under Evid.R. 404(B).

{¶60} Under Ohio law, it is well-settled that "[e]vidence of conduct designed to impede or prevent a witness from testifying is admissible as showing consciousness of guilt." *State v. Williams*, 79 Ohio St.3d 1, 11, 1997-Ohio-407 (1997). Appellant's conduct shows consciousness of guilt.

{¶61} As the trial court acted in compliance with the governing case law when it allowed Shaquetta's testimony and then instructed as to the relevancy of the evidence, appellant's fourth assignment is without merit.

{¶62} Under his fifth assignment, appellant asserts that he was denied a fair trial because, in instructing the jury, the trial court placed too much emphasis upon a specific rule governing the determination of witness credibility. That is, he argues that the court should not have expressly told the jury that proof of a specific fact can be based upon the testimony of one witness. It is appellant's position that, because his conviction was predicated solely upon the testimony of Russell Perry, the "one witness" instruction had the effect of placing undue importance on Russell's testimony.

{¶63} As the state correctly notes, the instruction given by the trial court was consistent with the standard instruction for the "one witness" rule. *See Ohio Jury Instructions*, Section CR409.05, at 73, (2012). Furthermore, in providing the disputed instruction, the trial court did not make any express reference to Russell or Shaquetta, thereby indicating that the rule could be applied to either. Rather, the rule was set forth in a group of standard instructions regarding the role of the jury in judging witness credibility.

{¶64} Except for Shaquetta's testimony concerning appellant's alleged offer to pay her and Russell off, the state's case against appellant was predicated entirely upon

16

Russell's testimony. Thus, the disputed instruction was appropriate; i.e., the jury needed to know that a finding of guilt could be based upon the testimony of one witness. In addition, the instruction was not stated in such way as to give it any greater weight than the other "credibility" instructions.

{¶65} Therefore, appellant's fifth assignment is not well taken.

{¶66} Under his sixth assignment, appellant maintains that he was denied a fair trial in light of certain statements the trial court made to the jury as part of its preliminary instructions regarding the consideration of the evidence. Specifically, he notes that the court informed the jury that even if an accomplice did not possess a firearm during the execution of a crime, he could still be found guilty of a firearm specification if the main offender had a firearm. Appellant asserts this instruction placed too much emphasis on his role as an accomplice in the underlying incident.

{¶67} The decision to employ a particular jury instruction in a given criminal case lies within the sound discretion of the trial court, and cannot form the grounds to reverse a conviction unless an abuse of discretion took place. *State v. Nichols*, 11th Dist. Lake No. 2005-L-017, 2006-Ohio-2934, ¶28. As a general proposition, a jury instruction is proper if it sets forth a plain and unambiguous statement of the law that is pertinent to the case in light of the pleadings and the evidence presented at trial. *Id.* at ¶30.

{¶68} The disputed instruction concerning complicity as to a firearm specification was clearly relevant to appellant's role in the home invasion and set forth a proper statement of the governing case law. In *State v. Fitzgerald*, 11th Dist. Lake No. 2003-L-084, 2004-Ohio-6173, ¶62, fn. 3, this court held that "where the state proves beyond a reasonable doubt that a party acted in complicity to aggravated robbery and the

17

principal offenders possessed firearms, that party may be 'prosecuted and punished as if he were a principal offender.'" To the extent that it was necessary for the jury to know that appellant could be found guilty under the firearm specifications even if he did not have actual possession of the handgun during the incident, the trial court's preliminary "complicity" instruction was a correct statement of law. Accordingly, appellant's sixth assignment is without merit.

{¶69} Under his seventh assignment, appellant submits that the trial court erred in instructing the jury on the mens rea of "purposefully." This argument is based upon the following sentence from the jury instructions:

{¶70} "When the central idea, essence, or gist of the offense is a prohibition against or forbidding of conduct of a certain nature, a person acts purposely if his specific intention was to engage in conduct of that nature, regardless of what he may have intended to accomplish by his conduct."

{¶71} Citing the "gist of the offense" language, appellant asserts the instruction was needlessly confusing and had the effect of lessening the burden of proof the state had to carry in order to establish the mens rea.

{¶72} In support of his argument, appellant relies upon the decision of the Ohio Supreme Court in *State v. Wilson*, 74 Ohio St.3d 381, 1996-Ohio-103 (1996). In *Wilson*, the disputed instruction provided:

{¶73} "'A person acts purposely, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, if it is his specific intention to engage in conduct of that nature.'" *Id*. at 392.

18

{¶74} In analyzing the foregoing instruction, the *Wilson* court first concluded that the inclusion of the "gist of the offense" language did create some confusion regarding what constituted "purposeful" behavior. *Id.*, at 393. However, upon reviewing the "gist" language in the context of the entire instruction, the *Wilson* court held that no plain error had occurred because the entire instruction had been adequate to properly define the element of specific intent. *Id.*

{¶75} In applying the *Wilson* precedent, the Eighth Appellate District has held that the trial court's use of the "gist of the offense" language does not have the effect of diluting the state's burden of proof when the term "purposefully" is otherwise properly defined in the instructions. *State v. Hamilton*, 8th Dist. Cuyahoga No 86520, 2006-Ohio-1949, ¶46.

{¶76} In this case, the trial court used the "gist" language twice in its instructions to the jury. In the first instance, the "gist" language was included as part of the following discussion of the definition of purposeful behavior:

{¶77} "A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to commit a criminal offense in the occupied structure. When the central idea, essence, or gist of the offense is a prohibition against or forbidding of conduct of a certain nature, a person acts purposely if his specific intention was to engage in conduct of that nature, regardless of what he may have intended to accomplish by his conduct. Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally.

19

Purpose and intent mean the same thing."

{¶78} When the trial court used the "gist" language the second time, it was included in a discussion which was virtually identical to the foregoing quote.

{¶79} The term "purposely" is defined in R.C 2901.22(A):

{¶80} "(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

{¶81} When considered as a whole, the definition of the term "purposely" in the trial court's jury instructions was sufficiently consistent with the statutory definition to adequately instruct the jury. Therefore, the use of the "gist" language did not have the effect of diluting the state's burden of proof on the "purposely" element. *Hamilton.* For this reason, appellant's seventh assignment is not well taken.

{¶82} Under his next assignment, appellant maintains that the trial court erred when it failed to instruct the jury that it was required to reach a unanimous verdict as to whether he had been the principal offender or an aider and abettor in the commission of the various offenses. He states that complicity constitutes a separate theory regarding the role he played in the incident, and that the jury had to agree as to the nature of that role before he could be found guilty.

{¶83} Under Ohio law, the legal distinction between principal offender and aider and abettor is not viewed as significant. R.C. 2923.03(F) provides that a person who is guilty of complicity "shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal

20

offender."

{¶84} In light of the foregoing, the failure to require the jury to distinguish on the verdict forms whether the defendant was found guilty as an aider and abettor is not a plain error warranting the reversal of a conviction. *See State v. Beshara*, 7th Dist. Mahoning No. 07 MA 37, 2009-Ohio-6529, ¶77. The same logic would likewise apply to any alleged error in the trial court's instructions as to the need for a unanimous verdict regarding the role of appellant in the commission of the underlying offenses.

{¶85} In this case, appellant's trial counsel never objected to the trial court's jury instructions concerning whether he had acted as an aider and abettor; hence, a plain error can only be found when, inter alia, the outcome of the trial was adversely affected. *Id.* at ¶75. Here, the state's evidence was overwhelming that appellant had acted as a principal offender in relation to the offenses against Russell Perry, and an aider and abettor as to those offenses against Shaquetta Page. That is, if the jury believed the testimony of Russell and Shaquetta, there would be no factual dispute concerning the role appellant played in each of the three remaining charges. Therefore, since appellant was not prejudiced by any alleged error pertaining to the complicity jury instructions, his eighth assignment of error lacks merit.

{¶86} Under his ninth assignment, appellant claims that the trial court's decision to impose consecutive prison terms in regard to the aggravated burglary count and the two aggravated robbery counts was contrary to law. Citing R.C. 2929.14(E), he asserts that the trial court only had the statutory authority to impose consecutive terms if he was convicted of a violent sex offense, a designated homicide, an assault, or a kidnapping offense. According to appellant, since aggravated burglary and aggravated robbery are

21

not cited in R.C. 2929.14(E), he could only be required to serve concurrent terms.

{¶87} In responding to this assignment, the state aptly notes that R.C. Chapter 2929 sets forth a number of different standards governing the imposition of consecutive terms by a trial court. The state further notes that the primary standard for consecutive terms is delineated in R.C.2929.14(C)(4):

{¶88} "(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

{¶89} "* * *

{¶90} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

{¶91} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

{¶92} Although the trial court in this case did not expressly refer to the foregoing standard during the sentencing hearing, statements made by the court at that hearing plainly shows that the decision to impose consecutive prison terms was predicated upon

22

R.C. 2929.14(C)(4).   Specifically, after the trial court allowed appellant and the co-defendant to address the issue of sentencing, it made the following findings as to both of them:

{¶93}  "The Court determines that consecutive sentences are called for here, not only because of the firearm specifications, which are mandatory consecutive sentences, but also as to the underlying crimes.  The Court believes that consecutive sentences are necessary to protect the public and punish the offenders.  Consecutive sentences would not be disproportionate to the conduct and to the danger the offenders pose.  The Court finds that the harm was so great or unusual that a single term does not adequately reflect the seriousness of the conduct and that the offenders' criminal history, particularly as to the Defendant Ricci Lewis shows that consecutive terms are needed to protect the public."

{¶94}  The trial court clearly made the requisite findings to impose consecutive prison terms under R.C. 2929.14(C)(4).  In contesting the legality of his sentence before this court, appellant has not challenged whether those findings were supported.  Hence, since the decision to impose consecutive sentences was made in accordance with the governing statutory law, appellant's ninth assignment lacks merit.

{¶95}  Appellant's tenth assignment also raises a challenge to the imposition of consecutive prison terms on the remaining underlying offenses.  He asserts that the trial court never made any specific factual findings that justified consecutive terms.  Instead, according to him, the court merely made a rote statement of the statutory criteria without providing a substantive discussion.

{¶96}  In making this argument, appellant does not reference the standard for the

23

imposition of consecutive sentences under R.C. 2929.14(C)(4). Rather, his argument is predicated entirely upon the following statement of the trial court during the sentencing hearing:

{¶97} "The Court determines that there was a separate animus in the commission of the robbery and the burglary. The burglary could have been committed entirely without committing an aggravated robbery. And that once the individual invaded this household, forced their way in, they immediately took control of the situation by committing an aggravated robbery with firearms. *And that that's an additional reason why this Court believes consecutive sentences are absolutely necessary here.*" (Emphasis added.)

{¶98} As previously noted in our discussion of appellant's ninth assignment, as part of its sentencing analysis earlier in the sentencing hearing, the trial court had made express factual findings regarding the criteria for consecutive prison terms under R.C. 2929.14(C)(4). Thus, in making the italicized statement at the end of the foregoing quote, the court was not stating its entire justification for consecutive terms. Instead, as the court readily indicated, it was merely providing an additional reason in support of its decision on the "consecutive terms" issue.

{¶99} Taken as a whole, there is nothing to establish that the trial court failed to consider the governing statutory criteria prior to deciding to impose consecutive prison terms in relation to the remaining aggravated burglary count and the two aggravated robbery counts. For this reason, appellant's tenth assignment does not have merit.

{¶100} Under his eleventh assignment, appellant submits that the trial court erred in imposing two three-year terms under two of the firearm specifications. According to

24

him, the statutory provision governing the imposition of sentence for such specifications only allowed the trial court to order one three-year term under one specification. Citing R.C. 2929.14(B)(1)(b), he argues that multiple three-year terms are impermissible when all of the firearm specifications were committed as part of one continuous transaction.

{¶101} Each of the six firearm specifications against appellant was brought under R.C. 2941.415, and essentially alleged that a firearm had been displayed or brandished during the commission of underlying felony offense. R.C. 2929.14(B)(1)(a)(ii) provides that a three-year term can be imposed when the criminal defendant is found guilty of a firearm specification under R.C. 2941.415.

{¶102} As to the imposition of multiple three-year terms for firearm specifications, R.C. 2929.14(B)(1)(b) generally states that multiple terms are not permissible when the underlying felonies were "committed as part of the same act or transaction." However, R.C. 2929.14(B)(1)b) also expressly provides that an exception to the foregoing general rule is set forth in division (B)(1)(g) of the statute:

{¶103} "(g) If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies is aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of

25

the remaining specifications."

{¶104} Appellant was convicted of two counts of aggravated robbery, one as to Russell and one as to Shaquetta. Given that aggravated robbery is one of the specific felonies listed in R.C. 2929.14(B)(1)(g), the "same act or transaction" rule under division (B)(1)(b) was inapplicable in this instance. Instead, the trial court was required to follow the exception in division (B)(1)(g), which expressly mandates that a separate prison term be imposed for each of the two most serious firearm specifications. To this extent, because each of the two remaining aggravated robbery counts contained firearm specifications of which appellant was convicted, the trial court simply had no discretion in imposing two three-year terms for the specifications. Therefore, appellant's eleventh assignment is not well-taken.

{¶105} Under his twelfth assignment, appellant claims that the trial court violated his constitutional right to equal protection by imposing an aggregate sentence which is longer than the total sentence given to his co-defendant, Carvell Fomby. Specifically, he notes that he was ordered to serve an aggregate term of twenty years, while Fomby is only required to serve seventeen years. Appellant submits that this result was unjust because it was Fomby who wielded the firearm during the alleged incident.

{¶106} R.C. 2929.11(B) expressly requires that Ohio's sentencing guidelines are to be applied consistently by trial courts. In relation to the goal of consistency, "[w]e have held that sentencing consistency is not derived from the trial court's comparison of the current case to other sentences given to similar offenders for similar offenses. * * * Rather, it is the trial court's proper application of the statutory sentencing guidelines that ensures consistency. * * * Thus, in order to show a sentence is inconsistent, a

defendant must show the trial court failed to properly consider the statutory factors and guidelines." *State v. Greitzer*, 11th Dist. Portage No. 2006-P-0090, 2007-Ohio-6721, ¶24.

{¶107} In summarizing the guidelines for felony sentencing under Ohio's statutory scheme, this court has stated:

{¶108} "R.C. 2929.11(A) provides that a trial court that sentences an offender for a felony conviction must be guided by the 'overriding purposes of felony sentencing.' Those purposes are to 'protect the public from future crimes by the offender and others and to punish the offender.' R.C. 2929.11(B) provides that a felony sentence must be reasonably calculated to achieve the purposes set forth under R.C. 2929.11(A), commensurate with and not demeaning to the seriousness of the crime and its impact on the victim, and consistent with sentences imposed for similar crimes committed by similar offenders. Finally, R.C. 2929.12 sets forth factors concerning the seriousness of the offense and recidivism factors." *State v. Cross*, 11th Dist. Lake No. 2006-L-135, 2007- Ohio-3847, ¶23.

{¶109} The trial court's decision to give appellant a longer aggregate sentence was clearly based upon recidivism factors. During the sentencing hearing, the state established that appellant had a substantial criminal record which included more than ten previous convictions. Given that appellant's past record was significantly worse than that of the co-defendant, the trial court could reasonably conclude that appellant posed a greater risk to the general public, and thus should be incarcerated for a longer time period.

{¶110} Taken as a whole, the decision to impose three additional years of

incarceration was predicated upon a proper application of the statutory sentencing factors. Therefore, since appellant's right to equal protection of the law was not violated, his twelfth assignment is not well-taken.

{¶111} Under his thirteenth assignment, appellant asserts that the trial court erred in not merging the two remaining counts of aggravated robbery into the sole remaining count of aggravated burglary. Without addressing the question of whether foregoing crimes are allied offenses of similar import, appellant maintains that separate sentences could not be imposed for all three remaining offenses because the evidence established that the aggravated burglary and the two aggravated robberies were committed as part of one continuous criminal act.

{¶112} The legal effect of a defendant's conviction on multiple crimes is governed by R.C. 2941.25:

{¶113} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶114} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶115} In its most recent pronouncement on the "allied offenses" issue, a plurality of the Supreme Court of Ohio summarized its general application of R.C. 2941.25:

{¶116} "In determining whether offenses are allied offenses of similar import

28

under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct.  * * *.  If the offenses correspond to such a degree that the conduct of the defendant constituting the commission of one offense constitutes commission of the other, then the offenses are of similar import.

{¶117} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'  * * *.

{¶118} "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

{¶119} "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge."  (Citations omitted and emphasis sic.) *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶48-51.

{¶120} Although the foregoing analysis was only followed by a plurality of the Supreme Court, this court expressly adopted the *Johnson* analysis in *State v. Muncy*, 11th Dist. Ashtabula No. 2011-A-0066, 2012-Ohio-2830.

{¶121} At the outset of our analysis in this case, it must be noted that appellant was only sentenced on the first, second and fourth counts of the indictment, as amended after the state dismissed the charge of complicity to aggravated robbery. Consistent with the trial court's instructions to the jury, the fourth count of the indictment charged appellant with aggravated robbery pertaining solely to Shaquetta.  In contrast, the first and second counts of the indictment, under which appellant was charged with

29

aggravated burglary and aggravated robbery, respectively, related solely to Russell.

{¶122} When the same offense is committed against different victims during the same course of conduct, there is a separate animus as to each victim; therefore, under such circumstances, the multiple offenses are not deemed "allied" for purposes of R.C. 2941.25, and a separate sentence can be imposed for each offense. *State v. Chaney*, 8th Dist. Cuyahoga No. 97872, 2012-Ohio-4933, ¶26-28. In light of this, the aggravated robbery count as to Shaquetta could never be merged with either of the remaining two counts as to Russell. Accordingly, our analysis under this assignment must focus upon whether the trial court should have merged the two "Russell" counts together. As part of its oral discussion during the sentencing hearing, the trial court determined that the aggravated burglary charge under count one could not be merged with the remaining aggravated robbery count as to Russell because appellant had a separate animus for each offense.

{¶123} Under the first count, appellant was charged with aggravated burglary under R.C. 2911.11(A)(1), which provides:

{¶124} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:

{¶125} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another; * * *."

{¶126} Under the second count of the indictment, appellant was charged with aggravated robbery pursuant to R.C. 2911.01(A)(1), which states:

30

**{¶127}** "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

**{¶128}** "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; * * *."

**{¶129}** It is possible to commit aggravated burglary and aggravated robbery with the same conduct. However, a trial court can still impose separate prison terms for the two offenses if, pursuant to R.C. 2941.25(B), the crimes were not committed by the same conduct. The two offenses are allied and must be merged for sentencing only when "the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Johnson*, 2010-Ohio-6314, at ¶49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶50.

**{¶130}** The remaining aggravated robbery count relating to Russell was based upon the allegation that the co-defendant, Carvell Fomby, had a deadly weapon in his possession and displayed or brandished it. Fomby first displayed the firearm when he placed it on Russell's head immediately after the initial intrusion into the home. It was also at that point that Fomby told Russell that he and appellant wanted "everything" Russell had, thereby stating the intent to commit a theft offense against him. That conduct alone, in which appellant was complicit, satisfied all elements of aggravated robbery under R.C. 2911.01(A)(1).

**{¶131}** Under R.C. 2911.11(A)(1), the aggravated burglary as to Russell was fulfilled when appellant inflicted physical harm to Russell in the ensuing scuffle ending

by the refrigerator. Given that the physical harm element for aggravated burglary was committed by additional subsequent conduct that was not needed to prove the aggravated robbery, the counts do not merge.

{¶132} In other words, separate sentences are permitted for the two offenses against Russell because the commission of the two crimes were not based upon the exact same conduct; i.e., an additional act was performed which, although unnecessary for the commission of aggravated robbery, completed the offense of aggravated burglary. If a separate penalty could not be imposed for the aggravated burglary, it would essentially mean that appellant and Formby would be free to inflict physical harm upon Russell without having to face additional penalty. Such a result was clearly not intended by the General Assembly in enacting R.C. 2941.25(B). *See State v. Frazier*, 58 Ohio St.2d 253 (1979); *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶68; *State v. ONeil*, 11th Dist. Portage No. 2010-P-0041, 2011-Ohio-2202, ¶46-51.

{¶133} The trial court correctly imposed separate sentences regarding the aggravated burglary count and the aggravated robbery count relating to Russell Perry, as well as the separate aggravated robbery count pertaining to Shaquetta Page. Thus, appellant's thirteenth assignment lacks merit.

{¶134} Under his fourteenth assignment, appellant states that the trial court erred in imposing two concurrent eight-year terms on the two remaining counts of aggravated robbery. Essentially, he maintains that the two aggravated robbery counts should have been merged for purposes of sentencing because, under the facts of this case, he could not be convicted of both offenses. Appellant submits that the imposition of concurrent terms is impermissible when separate convictions were not feasible.

32

{¶135} In instructing the jury on these two counts, the trial court indicated that the first charge of aggravated robbery, as set forth in the second count of the indictment, related solely to Russell, and that the other remaining charge of aggravated robbery, as set forth under the fourth count of the indictment, pertained solely to Shaquetta. Furthermore, there was sufficient evidence to prove that appellant aided and abetted his co-defendant in the commission of separate offenses of aggravated robbery in relation to both victims.

{¶136} Since there were separate victims as to each of the two remaining counts of aggravated robbery, those charges were not "allied" offenses that had to be merged under R.C. 2941.25. *Chaney*, 2012-Ohio-4933, ¶26-28. Thus, because appellant could be convicted and sentenced on both counts, the imposition of concurrent prison terms was permissible. Appellant's fourteenth assignment is without merit.

{¶137} Under his next assignment, appellant contends that his entire conviction must be reversed because the indictment against him was multiplicitous in nature. He asserts that the six counts in the indictment were needlessly repetitive because Russell Perry was the sole victim under the charges.

{¶138} "An indictment is multiplicitious (sic) where it charges a single offense in multiple counts. *See e.g. State v. Ross*, 9th Dist. No. 09CA009742, 2012 Ohio 536, ¶69. '[T]he vice of a multiplicitious (sic) indictment lies in the possibility of multiple punishments for a single offense in violation of the cumulative punishment branch of the Double Jeopardy Clause of the Sixth Amendment.' *State v. Childs*, 88 Ohio St.3d 558, 561, 2000 Ohio 425, * * * (2000). Even if counts are multiplicitious (sic), however, merging them for purposes of sentencing, pursuant to R.C. 2941.25, will cure any threat

33

of double jeopardy. *Id.*" *State v. Hendrix*, 11th Dist. Lake No. 2011-L-043, 2012-Ohio-2832, ¶51.

{¶139} In this case, appellant's "multiplicitous" claim is based upon the assertion that all six charges heard by the jury related solely to one alleged victim, Russell Perry. However, the record does not support his assertion. Specifically, the record shows that the state went forward on the basis that Shaquetta was the victim under one count of aggravated burglary and one count of aggravated robbery.

{¶140} As to the four remaining counts pertaining solely to Russell, two of them charged the same offense, i.e., aggravated robbery. However, the two counts were predicated upon different behavior. That is, the first charge of aggravated robbery as to Russell, count two, was based upon the allegation that a handgun had been displayed or brandished during the commission of a theft offense, while the second charge, as set forth in count five, was predicated upon the allegation that there had been an attempt to inflict serious physical harm upon Russell during the commission of a theft offense.

{¶141} In light of the foregoing discussion, the indictment did not state repetitive charges alleging the identical offense as to the same victim. Hence, since the indictment against appellant was not multiplicitous, his fifteenth assignment does not set forth a meritorious reason for reversal.

{¶142} Under his sixteenth assignment, appellant contests the sufficiency of the state's evidence as it related to the aggravated robbery of Shaquetta. He contends that this particular charge should not have gone to the jury because there was no evidence that he ever directly confronted Shaquetta during the course of the incident. In support, he emphasizes that Shaquetta admitted that she never saw him that night.

34

{¶143} Appellant's conviction as to Shaquetta was based upon the theory that he aided and abetted Carvell Fomby in the commission of the aggravated robbery. Specifically, Russell Perry testified that appellant held him down on the kitchen floor while Fomby went through the rest of the home, including the upstairs where Shaquetta was present. Hence, since Fomby would not have been able to confront Shaquetta with the handgun and take her cell phone unless appellant restrained Russell, there was evidence from which the jury could find that appellant was guilty of complicity in the commission of the aggravated robbery. Appellant's sixteenth assignment lacks merit.

{¶144} Under his next assignment, appellant maintains that his conviction on all three remaining charges were against the manifest weight of the evidence. However, although appellant's brief cites a number of cases generally addressing the "manifest weight" standard, he never raises a specific argument concerning the evidence in this particular case.

{¶145} The trial testimony of Russell and Shaquetta did not contain any inherent inconsistencies of such a magnitude that would have rendered their version of events totally unbelievable. Moreover, when viewed as a whole, their testimony constitutes some competent evidence upon which the jury could find that all elements of the six offenses had been satisfied. Appellant's seventeenth assignment is without merit.

{¶146} Under his eighteenth assignment, appellant contends that the trial court's order concerning the payment of court costs must be reversed because the court failed to fully explain the legal ramifications of not paying such costs. Specifically, he claims the trial court failed to inform him that he could be subject to community service if he fails to pay in a timely fashion.

35

{¶147} R.C. 2947.23(A)(1) states that, in all criminal cases, the trial court has an obligation to include in the defendant's sentence an order requiring the payment of costs. Although the statute has subsequently been amended, at the time of appellant's sentencing, it further provided that, in imposing sentence, the court must orally notify the defendant of the following:

{¶148} "(a) If the defendant fails to pay that judgment or fails to timely make payments towards that judgment under a payment schedule approved by the court, the court may order the defendant to perform community service in an amount of not more than forty hours per month until the judgment is paid or until the court is satisfied that the defendant is in compliance with the approved payment schedule; [and]

{¶149} "(b) If the court orders the defendant to perform the community service, the defendant will receive credit upon the judgment at the specified hourly credit rate per hour of community service performed, and each hour of community service performed will reduce the judgment by that amount."

{¶150} In applying R.C. 2947.23(A)(1), this court has indicated that the statutory oral notification requirements are mandatory. *State v. Moore*, 11th Dist. Geauga No. 2011-G-3027, 2012-Ohio-3885, ¶82-84. During the sentencing hearing, the trial court did not give the required oral notification. However, there was no objection to the lack of oral notification. Under such circumstances, a "plain error" analysis must be applied. *See* Crim.R. 52(B); *State v. Jackson,* 10th Dist. Franklin Nos. 12-AP-768 & 12AP-769, 2013-Ohio-1152, ¶17.

{¶151} "Plain error exists only where, but for the error, the outcome of the trial would have been different. *State v. Bennett,* 11th Dist. No. 2002-A-0020, 2005-Ohio-

36

1567, ¶55. Therefore, to warrant reversal for plain error, this court must find that: (1) there was an error, i.e., a deviation from a legal rule; (2) the error was plain, i.e., there was an 'obvious' defect in the trial proceeding; and (3) the error affected substantial rights, i.e., affected the outcome of the trial. *Id.* at ¶56." *State v. Sawyer,* 11th Dist. Portage No. 2011-P-0003, 2012-Ohio-5199, ¶6

{¶152} In its final written judgment, the trial court expressly stated that appellant could be subject to community service under R.C. 2947.23(A) if he did not timely satisfy the "court costs" order; thus, appellant was provided with written, as opposed to oral, notice. Second, R.C. 2947.23(A) does not mandate the imposition of community service for lack of payment, but merely grants the trial court the ability to futuristically order community service in the event that the costs are not paid. The requirement is essentially an "if-maybe" notice. As a result, the oral notification only informs the defendant of a possible condition that may be later imposed. To this extent, the lack of proper oral notification does not have immediate effect. Third, given that the state can collect court costs through the garnishment of an inmate's prison account, *Jackson,* 2013-Ohio-1152, ¶17, appellant's court costs are likely to be paid before he is released and the "community control" provision is triggered.

{¶153} For these reasons, the trial court's failure to comply with the oral notification requirement of R.C. 2947.23(A)(1) had no adverse effect upon appellant's trial, as no miscarriage of justice occurred that would warrant a finding of plain error. Accordingly, appellant's eighteenth assignment is lacking in merit.

{¶154} Under his nineteenth assignment, appellant asserts that his due process rights were violated when his case was transferred to a new judge for purposes of trial.

Essentially, he argues that the transfer of the case was procedurally flawed because the transfer order was not signed by the administrative judge of the common pleas court.

{¶155} Appellant's case was originally assigned to Judge Vincent A. Culotta. On March 14, 2012, Judge Culotta issued a judgment granting appellant a second continuance and rescheduling his trial for April 24, 2012. On April 17, 2012, the state moved Judge Culotta to join appellant's case with Carvell Fomby's case, since the two cases involved the same offenses and were based upon the same incident. The next day, Judge Culotta issued a new judgment granting the motion for joinder. Since Fomby's case was assigned to Judge Eugene A. Lucci and was also scheduled to go forward on April 24, 2012, Judge Culotta further ordered that appellant's case be transferred to Judge Lucci.

{¶156} In arguing that only the administrative judge can order the transfer of an assigned case, appellant cites Sup.R. 36(B), governing the use of an individual assignment system for Ohio trial courts. It provides for a system in which a judge is responsible for the disposition of all issues in a case once it has been assigned to him or her by lot. The rule further provides that if the assigned judge is not available to dispose of a pending matter, the motion or issue can be heard by the administrative judge of the court.

{¶157} In interpreting a prior version of Sup.R. 36(B), the Eighth Appellate District has concluded that the transfer of an assigned case is only effective when the order is set forth in a journal entry executed by the administrative judge of the court. *Berger v. Berger*, 3 Ohio App.3d 125, 130 (1981). However, the same court has also held that any procedural defect in the transfer of an assigned case will be deemed waived if there

38

was no timely objection. *Militiev v. McGee*, 8th Dist. Cuyahoga No. 94779, 2010-Ohio-6481, ¶18.

{¶158} Appellant did not raise a timely objection to the transfer of his case from Judge Culotta. Thus, the issue is waived, and appellant's nineteenth assignment does not have merit.

{¶159} Under his final assignment, appellant asserts that he was denied effective assistance of trial counsel. In evaluating ineffective assistance claims, an appellate court must apply the two-part test promulgated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

{¶160} "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's error were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable."

{¶161} "* * * When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-688. "To warrant reversal, '(t)he defendant must show that there is a reasonable probability that, but for counsel's

39

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland*, *supra*, at 694.

{¶162} Without providing a specific argument, appellant claims the performance of his trial counsel was deficient in the following respects: (1) "Counsel failed to object to the host of leading questions asked by the prosecutor which contained the answers;" (2) "Counsel failed to object to the jury instructions which did not reflect the allegations of the indictment;" (3) "Counsel failed to object to the amendment of the indictment by the prosecutor and the court;" (4) "Counsel failed to object to the consolidation of the case and the transfer of the case from one judge to another;" (5) "Counsel failed to object to the 911 call which was made by a person who did not testify but rather the daughter of Shaquetta Page;" (6) "Counsel failed to object to hearsay where defendant's name was obtained from Shaquetta Page speaking with friends;" (7) "Counsel failed to object to an improper question which assumed that defendant was the one who left the premises when Shaquetta Page did not see defendant at all in the home that evening;" and (8) "Counsel failed to object to the sentencing by the court which imposed consecutive three year sentences when there was only one gun and defendant had no involvement with Shaquetta Page."

{¶163} Regarding appellant's second, third and eighth assertions, this court has already concluded that no prejudicial errors occurred in relation to these points. Hence, trial counsel did not act deficiently in failing to object.

{¶164} As to appellant's first assertion, the prosecutor asked the leading

40

questions while trying to refresh Russell Perry's memory of his prior testimony. Even if an objection should have been made, the failure did not alter the outcome of the trial based on the entirety of the record.

{¶165} Concerning appellant's fifth and sixth assertions, on the two occasions in question, the state sought to introduce statements from other persons. But, the state did not seek to introduce the statements for the truth of the matter asserted. Accordingly, the lack of objection was appropriate.

{¶166} As to appellant's fourth and seventh assertions, the record does support the conclusion that a proper objection could have been raised as to the transfer of the case to another judge and the disputed question which assumed that appellant had been inside the home. However, the record also supports the conclusion that the lack of objections did not have an adverse effect upon the outcome, as the evidence against appellant was substantial and unrefuted.

{¶167} Pursuant to the foregoing, appellant has failed to establish that he was denied effective assistance of trial counsel. Therefore, his twentieth assignment is without merit.

{¶168} Consistent with the foregoing, each of appellant's twenty assignments of error is meritless. Therefore, it is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

TIMOTHY P. CANNON, P.J., concurs in part and concurs in judgment only in part with Concurring Opinion,

COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part with Concurring/Dissenting Opinion.

41

_____

TIMOTHY P. CANNON, P.J., concurring in part and concurring in judgment only in part.

{¶169} I concur in judgment only as applied to appellant's assignment of error number 18 involving former R.C. 2947.23(A)(1)(a). Though the majority adopts a plain-error analysis, the recent precedent of this court focuses on the Ohio Supreme Court's emphasis on the obligatory language of the former statute in *State v. Smith*, 131 Ohio St.3d 297, 2012-Ohio-781. *See State v. Field*, 11th Dist. Geauga No. 2012-G-3082, 2013-Ohio-2257, ¶33; *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶71-72; and *State v. Taylor*, 11th Dist. Portage No. 2011-P-0090, 2012-Ohio-3890, ¶43.

{¶170} I concur with the more straightforward approach of the Second Appellate District in resolving this issue: simply acknowledge the error, modify the judgment to eliminate any possibility that the appellant could be required to perform community service as an option in lieu of paying costs, and then affirm the judgment as modified. *See State v. Veal*, 2d Dist. Montgomery No. 25253, 2013-Ohio-1577, ¶20; and *State v. Haney*, 2d Dist. Montgomery No. 25344, 2013-Ohio-1924, ¶21. Only a few cases will require this approach given the statute's recent amendment.

{¶171} I concur with the majority's judgment and reasoning as applied to all remaining assignments of error.

_____

COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part with Concurring/Dissenting Opinion.

42

{¶172} I concur with the majority regarding the disposition of appellant Ricci Lewis' assignments of error Nos. 1 through 12 and Nos. 14 through 20. I respectfully dissent regarding assignment of error No. 13.

{¶173} The majority reaches the decision that appellant Ricci Lewis' offenses of aggravated burglary and aggravated robbery do not merge because the two crimes were not committed with the exact same conduct. The majority notes that an additional act was performed—physical harm—that was not necessary for the commission of the aggravated robbery, yet completed the offense of aggravated burglary. However, in reaching this conclusion the majority has essentially substituted the "conduct of defendant" with the "elements of the offenses" in their allied-offense analysis. As such the majority's decision is reminiscent of the superseded *Rance* allied-offense standard and not the current standard announced by the Supreme Court of Ohio in *Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314.

{¶174} Our review of an allied offenses question is de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶12.

{¶175} "R.C. 2941.25 'codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offense.' *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, * * * ¶23. At the heart of R.C. 2941.25 is the judicial doctrine of merger; merger is 'the penal philosophy that a major crime often includes as inherent therein the component elements of other crimes and that these component elements, in legal effect, are merged in the major crime.' *State v. Botta*, 27 Ohio St.2d 196, 201 * * * (1971)." (Parallel citations omitted.) *Williams* at ¶13.

43

{¶176} "To ensure compliance with both R.C. 2941.25 and the Double Jeopardy Clause, 'a trial court is required to merge allied offenses of similar import at sentencing. Thus, when the issue of allied offenses is before the court, the question is not whether a particular sentence is justified, but whether the defendant may be sentenced upon all the offenses.' *Underwood* at ¶27." *Williams* at ¶15.

{¶177} The Supreme Court previously established a two-part test for analyzing allied-offense issues in *State v. Blankenship*, 38 Ohio St.3d 116, 117 (1988):

{¶178} In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's *conduct* is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses. (Emphasis sic.)

{¶179} Regarding the first element of that test, there was confusion among courts about the role the facts of the particular case played in the analysis. The Supreme Court tried to resolve this issue in *State v. Rance,* 85 Ohio St.3d 632 (1999) by employing an analysis that compared the statutory language of the two offenses in a vacuum to determine whether one necessarily included the elements of the other. The Supreme Court later determined that while *Rance* required courts to compare the elements of the

offense in the abstract, it did not require an exact alignment of elements. *State v. Cabrales,* 118 Ohio St.3d 54, 2008-Ohio-1625, ¶26-27.

**{¶180}** Two years later, in *Johnson*, *supra*, the Supreme Court abandoned the abstract analysis entirely, overruled *Rance*, and held that "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id.* at ¶44. The first question to be asked is whether "it is possible to commit one offense *and* commit the other with the same conduct * * *." (Emphasis sic.) *Id.* at ¶48. If so, then it must be determined whether the offenses were committed by a single act with a single state of mind. If both of these questions are answered affirmatively, then the offenses are allied offenses of similar import and will be merged. *Id.* at ¶49-50.

**{¶181}** The *Johnson* court also acknowledged the results of the above analysis will vary on a case-by-case basis. Hence, while two crimes in one case may merge, the same crimes in another may not. The court observed that inconsistencies in outcome are both necessary and permissible "* * * given that the statute instructs courts to examine a defendant's conduct – an inherently subjective determination." *Id.* at ¶52.

**{¶182}** Prior to *Johnson*, the Supreme Court consistently held the offenses of aggravated burglary and aggravated robbery were not allied offenses of similar import. See *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283; *State v. Williams*, 74 Ohio St.3d 569, 580 (1996); *State v. Barnes*, 25 Ohio St.3d 203, 207 (1986); *State v. Frazier*, 58 Ohio St. 2d 253, 256 (1979). After *Johnson*, this court, along with other appellate districts has held that aggravated robbery and aggravated burglary can be merged as allied offenses. *State v. Jarvi*, 11th Dist. Ashtabula No. 2011-A-0063, 2012-Ohio-5590,

¶24; *State v. Lacavera*, 8th Dist. Cuyahoga No. 96242, 2012-Ohio-800, ¶44-48; *State v. Shears*, 1st Dist. Hamilton No. C-120212, 2013-Ohio-1196, ¶41; *State v. Roper*, 9th Dist. Summit Nos. 26631, 26632, 2013-Ohio-2176, ¶11. And some districts have held that it is not possible to commit aggravated burglary and aggravated robbery with the same conduct. *State v. Hakim*, 6th Dist. Lucas No. L-10-1153, 2011-Ohio-5525, ¶43; *State v. Turner*, 2nd Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶23.

**{¶183}** However, as this court has held that the offenses of aggravated burglary and aggravated robbery *can* be merged, we move to the next step of determining whether Lewis' offenses *were* committed by the same conduct, i.e., "'a single act, committed with a single state of mind.' * * *." *Johnson*, *supra*, at ¶49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶50 (Lanzinger, J., dissenting).

**{¶184}** In conducting this analysis, some of the districts also appear to be conflating the "conduct of the defendant" with the "elements of the offenses." In *Shears*, *supra*, appellant was charged with aggravated burglary in violation of R.C. 2911.11(A)(1) (aggravating element: offender inflicts, or attempts to inflict physical harm on another) and aggravated robbery in violation of R.C. 2911.01(A)(3) (aggravating element: offender inflicts, or attempts to inflict, serious physical harm on another). *Shears* at ¶15. In *Shears* the victim was struck unconscious, placed in the trunk of a car—still alive—only to be found dead several days later. The First District held that the "conduct" that provided the aggravation for both counts was the same, thus requiring merger. *Id.* at ¶41.

**{¶185}** The defendant in *Jarvi*, *supra*, was charged under the same burglary and robbery statutes as the appellant in *Shears*. *Jarvi* at ¶17-23. The victim in *Jarvi* was

46

struck with a wooden club and subsequently died. *Id.* At ¶2. This court likewise held that the two offenses merged as "the two crimes were not committed separately or with a separate animus." *Id.* at ¶24.

{¶186} In this case, Lewis was charged with aggravated burglary in violation of R.C. 2911.11(A)(1) (aggravating element: offender inflicts, or attempts to inflict physical harm on another) and aggravated robbery in violation of R.C. 2911.01(A)(1) (aggravating element: having a deadly weapon on or about the offender's person). The majority reaches the decision that Lewis' offenses of aggravated burglary and aggravated robbery do not merge because an additional act was performed—physical harm—that was not necessary for the commission of the aggravated robbery, yet completed the offense of aggravated burglary. The majority refers to the "additional act" of causing physical harm to the victim, Russell Perry. However, causing physical harm is an *element* of aggravated burglary that is not contained in Lewis' charge of aggravated robbery. As such the majority appears to be concentrating on the *elements* of the offenses (a *Rance* analysis) and ignoring whether these offenses were committed by a single act with a single state of mind as *Johnson* instructs. *Johnson*, *supra*, at ¶49. Focusing on the "elements of the offenses" rather than the "conduct of the defendant" is tantamount to putting old wine in new bottles.

{¶187} It is true that the "elements of the offenses" and the "conduct of the defendant" will often correlate to such a degree that the resolution of the one question results in the resolution of the other. However, it is conduct and state of mind that is the focus of the second part of the *Johnson* test. The trial court in *Roper*, *supra*, held that the offenses of aggravated burglary and aggravated robbery merged even though the

47

"conduct" that provided the aggravation for both offenses did not correlate completely. *Roper* at ¶11. The defendants in *Roper* were charged with the same aggravated burglary and aggravated robbery offenses as Lewis. Even though the merger of the aggravated burglary and aggravated robbery charges by the trial court was not an issue on appeal, the Ninth District noted and approved the merger. *Id.* at ¶9.

{¶188} In *Lacavera*, *supra*, the Eighth District held that it was possible to commit aggravated burglary, aggravated robbery, kidnapping and felonious assault with the same conduct. *Id.* at ¶46. The court held that these offenses occurred as part of the same transaction and therefore were committed with the same animus. *Id.*

{¶189} While this writer feels that the Eighth and Ninth Districts have reached the correct results, neither case provides an analytical framework to be applied in future. Once it has been determined that it is possible to commit one offense and commit the other with the same conduct (the first part of the *Johnson* test) a framework for determining if the offenses comprise a single act, committed with a single state of mind, needs to be utilized. Such a framework was outlined by the Supreme Court when they defined a "transaction" as a ""series of continuous acts bound together by time, space and purpose…"" *State v. Wills*, 69 Ohio St.3d 690, 691 (1994), quoting *State v. Caldwell*, 9th Dist. Summit No. 14720, 1991 Ohio App. LEXIS, *34 (Dec. 4, 1991).

{¶190} An application of the "time, space and purpose" analysis leads to the conclusion that Lewis' offenses were part of one course of conduct.

{¶191} As the majority has outlined, this incident occurred as Russell Perry, one of the victims in this case, was putting out the trash at around 11:00 p.m. As Russell was re-entering the home and began to shut the back door, Lewis and his accomplice

48

(Fomby) pushed on the door and forced their way into the kitchen. As Russell tried to resist, Fomby produced a small firearm and placed the barrel on Russell's forehead. Lewis and Fomby pushed Russell across the room until he fell by the refrigerator. During the confrontation, Lewis and Fomby struck Russell on his head and he sustained scrapes and bruises on his face and skull. However, upon direct examination Russell could not recall if he was struck by the gun or by the hands of his assailants.

{¶192} After Russell was subdued, Lewis sat on top of him as Fomby went through the house and to the upstairs bedroom where he confronted Shaquetta Page. Fomby put the same small firearm to Shaquetta's head and stated that he was going to rob her. Upon hearing police sirens (Russell's daughter had called the police on her cell phone) both Lewis and Fomby exited the house.

{¶193} The aggravated burglary and aggravated robbery were both committed within a very brief period of time. Both offenses were committed virtually simultaneously. The robbery was committed immediately after Lewis and Fomby forced their way into the house. Thus an analysis of the time element supports merger.

{¶194} Apart from the fact that the two victims were located in separate parts of the house—this event occurred in a single location. As such an analysis of the space element also supports merger.

{¶195} The evidence is that Lewis and Fomby forced their way into the house (burglary) in order to commit theft (robbery). The manner of their actions suggests a single purpose that should lead to merger.

{¶196} The record in this case established that Lewis evidenced the same animus in committing both offenses. Looking to Lewis' conduct, this was a single act committed

49

with a single state of mind. Lewis committed the aggravated burglary as a means of implementing the aggravated robbery. Stated differently, the burglary was part of Lewis' efforts to obtain money through robbery.

{¶197} In *Jarvi*, *supra*, and *Shears*, *supra*, the appellants were charged with aggravated burglary and aggravated robbery. But due to the absence of a firearm, the aggravating "conduct" for each of these cases was the same—inflicting physical harm on another. In these cases the offenses of aggravated burglary and aggravated robbery merged. And it should not be overlooked that the victims in both *Jarvi* and *Shears* died as a result of their injuries. *Jarvi* at ¶24; *Shears* at ¶41.

{¶198} In the present case Lewis was likewise charged with aggravated burglary and aggravated robbery. But due to the presence of a firearm, the physical harm caused to Russell presents a differently charged aggravating element for the burglary offense than for the robbery offense. In the majority's view this difference prevents Lewis' offenses from merging.

{¶199} Lewis' six year sentence for aggravated burglary is to run consecutively to his eight year sentence for his aggravated robbery charges. Lewis was also sentenced to an additional six years on two, three-year gun specifications: all sentences to run consecutively for a total of twenty years. Yet the victim in this case only suffered scrapes and bruises on his face and skull while the victims in *Jarvi* and *Shears* died as a result of their injuries.

{¶200} The failure to merge Lewis' offenses cannot be reconciled in light of *Jarvi* and *Shears.* The majority's opinion does not comport with the purposes and principles of felony sentencing as delineated by R.C. 2941.25. It is incongruent that virtually the

50

same offenses will merge in one case where the victim died and not merge in another case where the victim suffered only minor injuries—due only to the presence of a firearm.

{¶201} The majority notes that if a separate penalty could not be imposed for the aggravated burglary, it would mean that Lewis would be free to inflict physical harm upon Russell without having to face additional penalty. But as the *Johnson* analysis instructs us to focus on conduct we are forced to ask: how is the conduct in this case distinguishable from *Shears* and *Jarvi* due to the presence of a firearm? In other words, how does the conduct of a physical assault imply a separate animus just because a firearm is present? Lewis was already sentenced to serve an additional six years due to the firearm specifications as applied to two victims (despite the fact that only one firearm was used in the commission of his offenses). If the presence of a firearm is the difference between whether or not Lewis' aggravated burglary and aggravated robbery offenses merge—then the majority is actually focusing on the elements of the offense and not the conduct of the defendant.

{¶202} The presence of a firearm already subjected Lewis to additional penalties pursuant to R.C. 2929.14. The failure of the trial court to merge the offenses of aggravated burglary and aggravated robbery in this case, combined with the consecutive sentences imposed, results in the type of shotgun conviction that *Johnson* advises against. Such a sentence heaps on a defendant multiple punishments for closely related offenses arising from the same transaction without any consideration or evidence in the record that the sentence complies with *Johnson* or the overall purposes and principles of sentencing. *Johnson, supra*, at ¶43.

{¶203} Thus, I respectfully dissent as to assignment of error No.13 and concur with the majority's judgment and reasoning as applied to all remaining assignments of error.